Filed 12/21/15;  part. pub. order 1/14/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

KAZEM MAJD,

    Plaintiff and Appellant,

      v.

BANK OF AMERICA, N.A., et al.,

    Defendants and Respondents.

G050250

(Super. Ct. No. 30-2012-00603633)

O P I N I O N

        Appeal from a judgment of the Superior Court of Orange County, Andrew P. Banks, Judge.  Affirmed in part and reversed in part.

        Kazem Majd, in pro. per.; Law Offices of Lenore Albert and Lenore L. Albert for Plaintiff and Appellant.

        Akerman, Justin D. Balser, Jeffrey Rasmussen and Karen Palladino Ciccone for Defendants and Respondents.

*        *        *

Plaintiff alleges defendants wrongfully foreclosed on his home. The court sustained a demurrer to the third amended complaint and entered a judgment of dismissal. On appeal, plaintiff contends the foreclosure was wrongful because irregularities in the securitization of his mortgage deprived defendants of authority to foreclose, and because the foreclosure occurred while the loan servicer was reviewing his loan for a modification under the Home Affordable Modification Program (HAMP). We agree with the latter contention and reverse as to plaintiff's cause of action against the loan servicer for violation of Business and Professions Code section 17200 et seq. (UCL). We also reverse some of the orders denying leave to amend. We conclude that plaintiff has otherwise stated a cause of action for wrongful foreclosure, provided the party conducting the foreclosure sale was an agent of the loan servicer. Plaintiff should be given leave to amend to allege that agency relationship, if true. Finally, plaintiff has otherwise stated a cause of action for cancellation of the trustee's deed upon sale, but has failed to join the foreclosing trust deed beneficiary as a defendant. The foreclosing beneficiary, who allegedly purchased the property at the foreclosure sale, is an indispensable party. Provided the property is still owned of record by the foreclosing beneficiary, and not by a bona fide purchaser for value, plaintiff should be given leave to amend to add the foreclosing beneficiary as a party to the cause of action for cancellation of instruments. In all other respects the judgment is affirmed.

FACTS

Plaintiff's third amended complaint alleged the following facts.

Plaintiff owns property in Irvine, California (the subject property). In March 2006, plaintiff obtained an interest-only, adjustable-rate mortgage on the subject property for $600,000 from Country Wide Home Loans, Inc., which ultimately merged into defendant Bank of America, N.A. (Bank of America). "Because of the constant

2

increases in the monthly payment, the loan became unaffordable. . . . [I]n the Spring of 2011, Plaintiff's mortgage payments jumped from $3,231.56 to $5,311.92."

In November 2011, the deed of trust was assigned to Citibank, N.A. (Citibank), as trustee for a securitized trust, of which defendant Wells Fargo Bank, N.A. was the master servicer, trust administrator, and custodian of the certificate holders. Citibank is not a party to this lawsuit.[1] The assignment was signed by Loryn Stone on behalf of Mortgage Electronic Registration Systems, Inc. (MERS), who is also not a party to this lawsuit. Plaintiff alleged Stone "is a robo-signer for Bank of America who signs documents . . . and did not have the capacity to sign the documents. As a result, the document is defective and invalid. As the foreclosure action was based on these documents, the foreclosure action is also defective and invalid."

"Plaintiff alleges that the chain of title is broken because the transfer from [Bank of America] to the securitized trust occurred years after the closing date of the trust," which was in 2006. From this plaintiff concludes "the foreclosure is based upon void documents."

In November 2011, a notice of default was recorded by Recontrust Company, N.A. (Recontrust). Recontrust is not a party to this lawsuit.

In February 2012, plaintiff contacted Bank of America to inquire about a home loan modification. Bank of America assigned Lea Fontenot to the case and promptly scheduled a meeting. Plaintiff was told his request would be reviewed once he submitted his application and certain financial information. "Plaintiff promptly returned the documentation requested. [Bank of America] then requested different information. Plaintiff submitted the documentation requested and [was] then told . . . that he needed to reapply. Plaintiff complied with this request without delay."

---

[1] Originally, Citibank was a named defendant. For reasons not apparent in the record, plaintiff dropped Citibank when he filed the first amended complaint.

"On or about February 23, 2012, . . . a Notice of Trustee's Sale was recorded. This recording took place while Plaintiff was in loan modification review. [Bank of America] was dual tracking the foreclosure and the loan modification." The notice of trustee's sale was recorded by Recontrust.

"In early March, 2012, the underwriter for [Bank of America] requested more documentation for the active loan modification review. Plaintiff contacted . . . his CPA. It took approximately two months before [Bank of America] considered documentation from the CPA to be acceptable to them. By this time, the underwriter declined the modification and Ms. Fontenot from [Bank of America] informed Plaintiff that he would have to reapply for a loan modification. Plaintiff did so immediately."

Plaintiff met with Fontenot in May 2012, where she asked for additional bank statements, which plaintiff faxed on June 11, 2012.

On June 15, 2012, "Ms. Fontenot . . . requested via e-mail . . . information that had previously been faxed to [Bank of America] on May 29, 2012." That same day, Bank of America informed plaintiff by letter that his home loan modification application had been denied "because you did not provide us with the documents we requested." When plaintiff e-mailed Fontenot to update her, she replied, "That's not an issue at all, so don't worry."[2]

"On or about August 11, 2012, Plaintiff worked cooperatively and submitted all documents requested by [Bank of America]. It was confirmed that [Bank of America] received the completed loan modification package and did not request any

---

[2] At this point in the complaint, plaintiff starts playing fast and loose with the facts. He claims that he then received a letter from Bank of America thanking him for sending "*your complete financial and hardship documentation package*." However, the letter itself indicates a different loan than the loan at issue here. Plaintiff later claims he received an e-mail from Fontenot stating, "Congratulations on Your Trial Mod!!!" However, in a subsequent e-mail, Fontenot indicated that the "trial mod" pertained to a San Diego property.

4

additional documents. [Bank of America] stated that the foreclosure would not go forward during the loan modification process."

On August 14, 2012, plaintiff contacted Fontenot and reminded her that the subject property was scheduled to be sold on August 17, 2012. "Ms. Fontenot told Plaintiff that there was no reason for concern as she had already processed the request for postponement and the postponement is usually granted the day before the scheduled sale date."

In the evening of August 16, 2012, plaintiff received an e-mail from Fontenot stating the investor was not willing to postpone the trustee sale. The next day, Recontrust sold the subject property to Citibank as trustee for the securitized trust. On August 22, 2012, Bank of America wrote to plaintiff rejecting his loan modification application, stating, "Your loan is not eligible for a modification because you did not provide us with the documents we requested."

Sometime afterwards, "[p]laintiff's attorney was notified that [Bank of America] recently transferred the servicing of Plaintiff's loan to Defendant Nationstar while in negotiations for resolution with [Bank of America]."

Plaintiff filed suit in October 2012 against Bank of America, Wells Fargo, and Citibank. Although the record does not contain a copy of any of the pleadings prior to the third amended complaint, the minutes indicate that the defendants demurred. Rather than oppose the demurrer, plaintiff amended his complaint, naming only Bank of America and Wells Fargo as defendants. The defendants demurred to the amended complaint. The demurrer was sustained with leave to amend (with the exception of the demurrer to a cause of action for violation of the Homeowners' Bill of Rights, which was sustained without leave to amend). Plaintiff then filed a second amended complaint which added Nationstar as a defendant. Defendants demurred. The court again sustained the demurrer with leave to amend.

5

The operative complaint for purposes of this appeal is the third amended complaint, filed in December 2013.  It alleged the following causes of action:  wrongful foreclosure, negligent misrepresentation, violation of duty of good faith and fair dealing, promissory fraud/estoppel, unfair and deceptive practices (Bus. & Prof. Code, § 17200), and cancellation of instruments.  The named defendants were Wells Fargo, Bank of America, and Nationstar.  Defendants again demurred.

This time the court sustained the demurrer without leave to amend on two bases.  First, the "Third Amended Complaint fails to allege that Plaintiff has tendered the balance due on his Loan."  Second, the complaint failed to state sufficient facts to support any of the causes of action.  Plaintiff timely appealed from the ensuing judgment of dismissal.

DISCUSSION

There are two distinct theories of liability running throughout plaintiff's complaint.  The first is the foreclosure sale was void because the foreclosing parties lacked authority to foreclose because of defects in the securitization of plaintiff's mortgage.  The second theory is the foreclosure was wrongful because it occurred during the review period for his loan modification request.  We address each theory in turn.

*Plaintiff Lacks Standing to Assert Defects in the Securitization of His Loan*

From a steady line of recent cases in this state, the rule has emerged that a homeowner generally may not challenge a nonjudicial foreclosure on the basis that the wrong party is foreclosing without specific facts indicating it is the wrong party, together with prejudice to the homeowner.

The first of this line of cases was *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149 (*Gomes*).  There, the homeowner defaulted on a home loan

6

with a deed of trust that identified MERS as the beneficiary. (*Id.* at p. 1151.) The notice of default was sent, and a nonjudicial foreclosure process initiated, by parties not on the original deed of trust. (*Id.* at pp. 1151-1152.) The homeowner filed suit, alleging he did not know the identity of the note's beneficial owner, and alleged on information and belief that the parties carrying out the foreclosure process were not acting with the rightful owner's authority. (*Id.* at p. 1152.) The trial court sustained a demurrer. (*Id*. at p. 1153.)

The *Gomes* court affirmed. It premised its holding on the nature of California's nonjudicial foreclosure scheme (Civ. Code, §§ 2924-2924k), which provides "'a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust.' [Citation.] 'These provisions cover every aspect of exercise of the power of sale contained in a deed of trust.' [Citation.] 'The purposes of this comprehensive scheme are threefold: (1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser.' [Citation.] 'Because of the exhaustive nature of this scheme, California appellate courts have refused to read any additional requirements into the non-judicial foreclosure statute.'" (*Gomes*, *supra*, 192 Cal.App.4th at p. 1154.)

Given the exhaustive nature of the system, the court rejected the homeowner's argument that the statutory scheme, by "'necessary implication,'" permits a homeowner to "test whether the person initiating the foreclosure has the authority to do so." (*Gomes*, *supra*, 192 Cal.App.4th at p. 1155.) "Section 2924, subdivision (a)(1) states that a 'trustee, mortgagee, or beneficiary, or any of their authorized agents' may initiate the foreclosure process. However, nowhere does the statute provide for a judicial action to determine whether the person initiating the foreclosure process is indeed authorized, and we see no ground for implying such an action. [Citation.] Significantly,

7

'[n]onjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure, since there is no oversight by a court, "[n]either appraisal nor judicial determination of fair value is required," and the debtor has no postsale right of redemption.' [Citation.] The recognition of the right to bring a lawsuit to determine a nominee's authorization to proceed with foreclosure on behalf of the noteholder would fundamentally undermine the nonjudicial nature of the process and introduce the possibility of lawsuits filed solely for the purpose of delaying valid foreclosures." (*Id.* at p. 1155.)

Despite this apparently inflexible rule, *Gomes*, *supra*, 192 Cal.App.4th at page 1155, distinguished three similar federal district court cases where plaintiffs were permitted to proceed with a cause of action on the basis that, in those cases, the plaintiff identified a "*specific factual basis* for alleging that the foreclosure was not initiated by the correct party." (*Id.* at p. 1156.)

This language gave rise to a split of authority concerning whether a plaintiff may ever bring a cause of action to challenge a foreclosing party's authority in the context of a nonjudicial foreclosure, and our Supreme Court has recently granted review of a case on the issue. (*Yvanova v. New Century Mortgage Corp.*, review granted Aug. 27, 2014, S218973.) Plaintiff relies upon the only case to hold a plaintiff can bring such a claim, *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079 (*Glaski*).~**(AOB 24)**~

In *Glaski*, the homeowner's note and deed of trust were transferred to a securitization trust, and, as in the instant case, plaintiff alleged the transfer was defective because "the attempted transfers were made *after the closing date* of the securitized trust holding the pooled mortgages . . . ." (*Glaski*, *supra*, 218 Cal.App.4th at p. 1082.) The *Glaski* court concluded that "a borrower may challenge the securitized trust's chain of ownership by alleging the attempts to transfer the deed of trust to the securitized trust (which was formed under N.Y. law) occurred after the trust's closing date. Transfers that violate the terms of the trust instrument are void under New York trust law, and

8

borrowers have standing to challenge void assignments of their loans even though they are not a party to, or a third party beneficiary of, the assignment agreement." (*Id.* at p. 1083.)

With respect to standing, the *Glaski* court reasoned that while third parties have no standing to challenge an assignment merely *voidable* at the election of the assignor, a homeowner may challenge an assignment that is *void*. (*Glaski*, *supra*, 218 Cal.App.4th at pp. 1094-1095.) Interpreting a New York statute that had generated conflicting interpretations among various courts, the *Glaski* court concluded the best interpretation was that the attempted transfer to the securitization trust was void. This conclusion, it reasoned, "protects the beneficiaries of the . . . Securitized Trust from the potential adverse tax consequence of the trust losing its status as a [real estate mortgage investment conduit] trust under the Internal Revenue Code." (*Id.* at p. 1097.)

The *Glaski* court distinguished *Gomes* on two grounds. First, it narrowly interpreted *Gomes* as limited to challenges to the ability of the *nominee*, MERS, to participate in the foreclosure process. (*Glaski*, *supra*, 218 Cal.App.4th at pp. 1098-1099.) Second, the court relied on the "specific factual basis" language *Gomes* employed to distinguish the federal cases. (*Id.* at p. 1099.) *Glaski* found the plaintiff's allegations had met that requirement.

Several cases both before and after *Glaski* have reached the opposite conclusion. (E.g., *Mendoza v. JPMorgan Chase Bank, N.A.*, review granted Nov. 12, 2014, S220675; *Keshtgar v. U.S. Bank, N.A.*, review granted Oct. 1, 2014, S220012; *Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75; *Herrera v. Federal National Mortgage Assn.* (2012) 205 Cal.App.4th 1495; *Jenkins v. JPMorgan Chase Bank, N.A.* (2012) 216 Cal.App.4th 497; *Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256.) Federal courts have likewise largely rejected *Glaski* as unpersuasive. (See *Kan v. Guild Mortgage Co.* (2014) 230 Cal.App.4th 736, 744 [collecting cases].) In particular, the Second Circuit Court of Appeals has rejected

9

the *Glaski* court's analysis of the standing issue, holding that under New York law an improper transfer to an investment trust is *voidable*, not void, and thus a third party plaintiff has no standing to challenge such a transfer. (*Rajamin v. Deutsche Bank National Trust Co.* (2d Cir. 2014) 757 F.3d 79, 90.) And more recently the New York Supreme Court, Appellate Division, concluded a borrower has no standing to challenge improper assignments in this context. (*Wells Fargo Bank, N.A. v. Erobobo* (N.Y. 2015) 127 A.D.3d 1176, 1178 [9 N.Y.S.3d 312, 314] ["Erobobo, as a mortgagor whose loan is owned by a trust, does not have standing to challenge the plaintiff's possession or status as assignee of the note and mortgage based on purported noncompliance with certain provisions of the [pooling and servicing agreement]"].)

In our view, the principal defect in the *Glaski* court's analysis is its failure to assess prejudice. A plaintiff alleging a defect in the assignment of a mortgage must demonstrate prejudice. For example, in *Siliga v. Mortgage Electronic Registration Systems*, *Inc.*, *supra*, 219 Cal.App.4th 75, where the plaintiffs made essentially the same allegations as those made here, the court sustained a demurrer on, among other grounds, the plaintiffs' inability to demonstrate prejudice: "[T]he [plaintiffs] fail to allege any facts showing that they suffered prejudice as a result of any lack of authority of the parties participating in the foreclosure process. The [plaintiffs] do not dispute that they are in default under the note. The assignment of the deed of trust and the note did not change the [plaintiffs'] obligations under the note, and there is no reason to believe that . . . the original lender would have refrained from foreclosure in these circumstances. Absent any prejudice, the [plaintiffs] have no standing to complain about any alleged lack of authority or defective assignment." (*Id*. at p. 85.) Likewise, in *Fontenot v. Wells Fargo Bank*, *N.A.*, *supra*, 198 Cal.App.4th 256, where the plaintiff also challenged a foreclosure based on an invalid assignment of a mortgage, the court sustained a demurrer on the basis that plaintiff could not demonstrate prejudice: "Even if MERS lacked authority to transfer the note, it is difficult to conceive how plaintiff was prejudiced by

10

MERS's purported assignment, and there is no allegation to this effect. Because a promissory note is a negotiable instrument, a borrower must anticipate it can and might be transferred to another creditor. As to plaintiff, an assignment merely substituted one creditor for another, without changing her obligations under the note. Plaintiff effectively concedes she was in default, and she does not allege that the transfer to HSBC interfered in any manner with her payment of the note [citation], nor that the original lender would have refrained from foreclosure under the circumstances presented. If MERS indeed lacked authority to make the assignment, the true victim was not plaintiff but the original lender, which would have suffered the unauthorized loss of a $1 million promissory note." (*Id*. p. 272.)

The *Glaski* court's failure to assess prejudice is fatal to its holding, and thus we decline to follow it. In the absence of prejudice, a cause of action based on technicalities in the note and deed of trust's chain of title serves no other purpose than to permit the borrower to continue living in the home without paying for it. To the extent the various financial institutions involved object to the manner or validity of the assignments involved, they can sort the matter out themselves, probably without recourse to the courts. We see no benefit in permitting a defaulted borrower to maintain such a suit in the absence of real harm to the borrower.

And plaintiff has not alleged any such harm here. He has not alleged that transfers of his note and deed of trust interfered with his ability to pay. Nor has he alleged facts indicating that, absent the improper transfer, a foreclosure would not have proceeded. Nor has he alleged any other harm caused by the allegedly improper transfer. Accordingly, he does not have standing to challenge the foreclosure based on defects on the securitization process.

11

*Plaintiff Stated Causes of Action for Violation of the UCL and Wrongful Foreclosure*

We conclude, however, that plaintiff's second theory of liability — that foreclosure was improper during the modification review process — is a viable theory on which to base causes of action for violation of the UCL, wrongful foreclosure, and, potentially, cancellation of the trustee's deed upon sale. We begin by discussing the legal context for plaintiff's modification request. Next, we explain why plaintiff's allegations are sufficient. And we conclude by addressing the procedural bars urged by defendants, including standing and the tender rule.

1.         *Loan Modifications Under the HAMP*

Plaintiff alleges he requested a loan modification pursuant to HAMP. To provide the legal context for HAMP, its requirements, and its procedures, we quote extensively from *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547 (*Wigod*).

"In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110–343, 122 Stat. 3765. The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.' [Citation.] Congress also granted the Secretary the authority to 'use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.' [Citation.]

"Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure. The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers . . . . Under the terms of the SPAs, servicers agreed to identify homeowners

12

who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives. The SPAs stated that servicers 'shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . issued by the Treasury.' In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification by following what amounted to a three-step process:

"First, the borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750.

"Second, the servicer calculated a modification using a 'waterfall' method, applying enumerated changes in a specified order until the borrower's monthly mortgage payment ratio dropped 'as close as possible to 31 percent.'

"Third, the servicer applied a Net Present Value (NPV) test to assess whether the modified mortgage's value to the servicer would be greater than the return on the mortgage if unmodified. The NPV test is 'essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure.' [Citation.] If the NPV result was negative — that is, the value of the modified mortgage would be lower than the servicer's expected return after foreclosure — the servicer was not obliged to offer a modification. If the NPV was positive, however, the Treasury directives said that 'the servicer MUST offer the modification.'" (*Wigod*, *supra*, 673 F.3d at pp. 556-557, fn. omitted.)

13

"Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method. The trial period under the TPP lasted three or more months, during which time the lender 'must service the mortgage loan . . . in the same manner as it would service a loan in forbearance.' [Citation.] After the trial period, if the borrower complied with all terms of the TPP Agreement — including making all required payments and providing all required documentation — and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification." (*Wigod*, *supra*, 673 F.3d at p. 557.)

Of particular relevance to the present case, in 2010 the United States Department of the Treasury promulgated HAMP Supplemental Directive 10-02, which states, "A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale *unless* and *until* at least one of the following circumstances exists: [¶] The borrower is evaluated for HAMP *and is determined to be ineligible for the program*." (Last italics added.) HAMP Supplemental Directive 10-02 also provides a 30-day foreclosure moratorium following denial of a modification to permit borrowers to respond to the denial. "The servicer may not conduct a foreclosure sale within the 30 calendar days after the date of a Non-Approval Notice or any longer period required to review supplemental material provided by the borrower in response to a Non-Approval Notice unless the reason for the non-approval is" based on factors not pertinent here. (Making Home Affordable (Mar. 24, 2010) Supplemental Directive 10-02 at p. 5, <https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1002.pdf> [as of Dec. 14, 2015] (Supplemental Directive 10-02).) In other words, the servicer cannot foreclose until at least 30 days after the loan modification review is completed.

14

2. *Plaintiff's Allegations State Causes of Action for Violation of the UCL and Wrongful Foreclosure*

Plaintiff alleges he was dual tracked — that is, Bank of America initiated a loan modification review while simultaneously proceeding with foreclosure, ultimately foreclosing on plaintiff's property before the modification review was completed. Plaintiff claims this conduct violates the UCL. We agree.

Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . . ." "'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition — acts or practices which are unlawful, or unfair, or fraudulent.'" (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

"'[A]n "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]'" (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 719.) "'[W]here a claim of an unfair act or practice is predicated on public policy, . . . the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.'" (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.)

Civil Code section 2923.6 was amended in 2012 to prohibit dual tracking. (Stats. 2012, ch. 87, § 7.) It currently provides, "A mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until any of the following occurs: [¶] (1) The mortgage servicer makes a written determination that the borrower is not eligible for a first lien loan modification, and any appeal period pursuant to subdivision (d) has expired." (Civ. Code, § 2923.6 (c)(1).) This provision is not directly applicable here, however, because

15

Bank of America's actions in this case predate it. Nonetheless, the court in *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*) concluded the new legislation is still relevant in determining whether dual tracking is unfair: "[W]hile dual tracking may not have been forbidden by statute at the time, the new legislation and its legislative history may still contribute to its being considered 'unfair' for purposes of the UCL." (*Id*. at p. 907-908)

Jolley concluded that the practice of dual-tracking is unfair in the context of a construction loan where, notably, HAMP was not an issue. (*Jolley*, *supra*, 213 Cal.App.4th at p. 877.) All the more so, therefore, is dual-tracking unfair in the HAMP context, where not only does the policy of Civil Code section 2923.6 so counsel, but the HAMP guidelines in effect during the relevant time period *did* prohibit foreclosure while the modification request was pending. (Supplemental Directive 10-02, *supra*, at p. 5.) The guidelines went even further and prohibited foreclosure until 30 days after denial of a modification request to permit plaintiff to provide supplemental information to salvage his modification request. (*Ibid*.) In *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49 (*Lueras*), we determined that "'[s]elling the home at foreclosure within 30 days of receiving the written denial of modification in violation of the Making Home Affordable Guidelines'" was an unfair practice under the UCL. (*Id*. at p. 84.)

Plaintiff has also sufficiently alleged a violation of the UCL in Bank of America's ultimate denial of the modification request (which occurred five days after the foreclosure sale). The modification was ultimately denied on the ground that plaintiff failed to provide the documentation Bank of America requested. Plaintiff's complaint, however, alleges that he repeatedly provided Bank of America with the documentation it requested. In *Lueras* we held that "'[f]alsely representing that . . . [plaintiff] did not qualify for HAMP modification when, in fact . . . [plaintiff] did qualify for a HAMP modification" was an unfair practice under the UCL. (*Lueras*, *supra*, 221 Cal.App.4th at

16

p. 84.)  Plaintiff's allegation here is similar:  that Bank of America falsely asserted plaintiff had failed to provide the required documentation.

### 3.  *UCL Standing and the Tender Rule*

Having concluded plaintiff's allegations state a claim under the UCL, we now consider whether plaintiff has standing to assert the claim.  Only a plaintiff who has "suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to sue.  (Bus. & Prof. Code, § 17204.)  This requires a plaintiff to "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by* the unfair business practice or false advertising that is the gravamen of the claim."  (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset* ).)

There is no question that plaintiff alleged economic injury in the form of the loss of his home.  (*Lueras, supra*, 221 Cal.App.4th at p. 82 ["the allegation that [plaintiff's] home was sold at a foreclosure sale is sufficient to satisfy the economic injury prong of the standing requirement of [Business and Professional Code] section 17204"].)  The question is whether this injury was caused by Bank of America's conduct or, instead, by plaintiff's inability to pay his mortgage.  We conclude plaintiff has sufficiently alleged causation in that, had Bank of America properly waited to foreclose until 30 days after denying the loan modification request, plaintiff may have proven he *was* eligible for a modification.

Bank of America responds by asserting that plaintiff cannot establish prejudice because "HAMP does not require a loan servicer or lender to provide a borrower with a HAMP modification even where the borrower meets all of HAMP's eligibility requirements."  For this proposition Bank of America cites *Kimball v. Flagstar Bank F.S.B.* (S.D.Cal. 2012) 881 F.Supp.2d 1209, 1224.  That court simply repeated a statement found in an unpublished federal district court decision, which decision in turn

17

repeated a statement found in other unpublished district court decisions. However, this line of cases fails to analyze the relevant United States Department of the Treasury guidelines. As the court stated in *Wigod, supra*, 673 F.3d 547, where a borrower satisfies the relevant criteria, "'the servicer MUST offer the modification.'" (*Id*. at p. 557.) Indeed, the relevant United States Department of the Treasury guidelines state, "Following underwriting, [Net Present Value] evaluation and a determination, based on verified income, that a borrower qualifies for HAMP, servicers *will* place the borrower in a trial period plan (TPP). [¶] The trial period is three months in duration (or longer if necessary to comply with applicable contractual obligations) and governed by terms set forth in the TPP Notice. Borrowers who make all trial period payments timely and who satisfy all other trial period requirements *will* be offered a permanent modification." (Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages (June 1, 2015, version 4.5) <https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_45.pdf>, italics added.) Bank of America's statement, therefore, is simply incorrect.

Finally, we address the trial court's conclusion that plaintiff's claim is barred by his failure to tender the amount due on the loan. "[A]s a condition precedent to an action by the borrower to set aside the trustee's sale on the ground that the sale is voidable because of irregularities in the sale notice or procedure, the borrower must offer to pay the full amount of the debt for which the property was security." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 112 (*Lona*).) "The rationale behind the rule is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower]." (*FPCI RE–HAB 01 v. E & G Investments, Ltd.* (1989) 207 Cal.App.3d 1018, 1022.)

The *Lona* court, however, identified four exceptions to the tender rule, including this: "[A] tender may not be required where it would be inequitable to impose such a condition on the party challenging the sale." (*Lona*, *supra*, 202 Cal.App.4th at p. 113.) In *Fonteno v. Wells Fargo Bank, N.A.* (2014) 228 Cal.App.4th 1358 the court relied on this exception to reject a tender requirement where plaintiff claimed the bank foreclosed without first meeting with the borrower face to face, as required by the Federal Department of Housing and Urban Development (HUD) regulations that were incorporated into the deed of trust. A tender requirement, the court reasoned, would "defeat the purpose of paragraph 9 of the deed of trust and the relevant HUD regulations. The parties agreed that, should plaintiffs default, they would attempt to meet face-to-face to discuss loan modifications before any authority to foreclose accrued. Obviously, this provision was intended to govern a circumstance in which plaintiffs could not make full payment of the delinquent amount owed. In other words, defendants could not proceed with foreclosure without first attempting to discuss alternatives with plaintiffs, even though plaintiffs could not tender the full amount owed." (*Id.* at p. 1374.)

Similarly, in *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208 the court held no tender was required where plaintiff sued to stop a foreclosure because the lender had failed to comply with a requirement that it meet with the borrower to explore steps to avoid foreclosure. (*Id.* at p. 213-214.) The court explained, "Case law requiring payment or tender of the full amount of payment before any foreclosure sale can be postponed [citation] arises out of a paradigm where, *by definition,* there is no way that a foreclosure sale can be avoided absent payment of *all* the indebtedness. Any irregularities in the sale would necessarily be harmless to the borrower if there was no full tender. [Citation.] By contrast, the whole point of [Civil Code] section 2923.5 is to create a new, even if limited, right to be contacted about the possibility of *alternatives* to full payment of arrearages. It would be contradictory to thwart the very operation of the statute if enforcement were predicated on full tender." (*Id.* at p. 225.)

19

The rule applies in a similar fashion here. The purpose of the modification rules is to avoid a foreclosure despite the borrower being incapable of complying with the terms of the original loan. It would be contradictory to require the borrower to tender the amount due on the original loan in such circumstances. Moreover, the purpose of the tender rule is to dismiss suits at an early stage, where, despite any irregularities in the lender's foreclosure activities, the borrower will ultimately have to pay the amount due on the loan, but cannot do so. Such suits are essentially futile. This is not such a case, as a loan modification is an alternative to foreclosure that does not require the borrower to pay pursuant to the terms of the original loan. Accordingly, the tender rule does not apply, and plaintiff may proceed with his UCL claim.

Similar considerations also lead us to conclude plaintiff can allege facts supporting a cause of action for wrongful foreclosure. The elements of the tort of wrongful foreclosure are: "'(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering'"; and (4) "'no breach of condition or failure of performance existed on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale.'" (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408.) Expanding on the fourth element, we previously explained, "In other words, mere technical violations of the foreclosure process will not give rise to a tort claim; the foreclosure must have been entirely unauthorized on the facts of the case." (*Id.* at p. 409.)

Tracking these elements, plaintiff alleged the foreclosure was in breach of Bank of America's legal obligations and that his modification was denied on a false claim that he failed to produce all required documentation. As we explained above, plaintiff alleged prejudice in that he may have been able to avoid the foreclosure had Bank of America completed the modification review process in good faith. Plaintiff was excused from tendering. And, under the facts as alleged, foreclosure was not authorized.

Under the current state of the complaint, however, the wrongful foreclosure claim suffers a fundamental defect — the foreclosure was performed by Recontrust. Recontrust is not a party, and there is no allegation that Recontrust was Bank of America's agent, or that Recontrust was otherwise acting on Bank of America's instructions. This defect, however, would seem to be easily remedied by amendment. Supplemental Directive 10-02, quoted more fully above, states, "A servicer may not *refer* any loan to foreclosure or conduct a scheduled foreclosure sale" until the modification review process is complete. (Supplemental Directive 10-02 at p. 5, italics added.) Here, it is doubtful that Recontrust would have proceeded without the loan servicer's referral, and similar agency allegations are so routinely included in complaints that plaintiff, in fairness, should be given an opportunity to make such an allegation, especially since plaintiff has otherwise adequately stated a claim for wrongful foreclosure.

*Plaintiff's Allegations Are Inadequate to Support a Cause of Action for Negligent Misrepresentation*

The elements of negligent misrepresentation are: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages. (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 792.)

Plaintiff's claim fails at the first element. He contends in his opening brief that "he was assured the foreclosure sale of his home was postponed while his loan modification was being processed." But according to the allegations of the operative complaint, Fontenot did not unconditionally say plaintiff's requested postponement would be granted. Instead, she said she had made a request to postpone the foreclosure, and such requests are "usually" granted the day before the sale. And while her comment that plaintiff need not be concerned indicated her expectation that the request would be granted, her comment was not tantamount to a representation that it would be granted. An actionable misrepresentation has not been alleged.

Additionally, the alleged misrepresentation did not cause damages. Plaintiff does not allege any facts indicating he suffered damages in reliance on Fontenot's confidence in her requested postponement of the sale. Plaintiff's conclusory allegation simply states, "Plaintiff reasonably and justifiably relied on the representation to his detriment." There is no allegation, for example, that plaintiff expended any money or declined other available offers in reliance on Fontenot's alleged misrepresentation. To the extent plaintiff was damaged, it was by the foreclosure sale itself, not by any representation about the sale being postponed. This omission is fatal to plaintiff's claim for negligent misrepresentation.

*Promissory Fraud, Estoppel, and Good Faith and Fair Dealing*

Plaintiff concedes on appeal that his cause of action for promissory fraud/estoppel fails. "Because the parties did not enter into a contract, this cause of action has not been properly alleged and plaintiff does not appeal that ruling." This same consideration defeats his cause of action for violation of a duty of good faith and fair dealing. Such a duty applies to contractual obligations and tort duties under special relationships such as an insurer and insured. But plaintiff has not cited any authority that such a duty would apply here outside of a contract, and we are aware of none.

22

*Cancellation of Instruments*

Plaintiff asserted a cause of action for "cancellation of instruments," under Civil Code section 3412 seeking to cancel the assignment of the deed of trust to Citibank, the notice of default, the notice of trustee's sale, and the trustee's deed upon sale. To the extent plaintiff seeks to cancel the assignments involving the securitized trust, we affirm the court's ruling based on plaintiff's lack of standing, as explained above. To the extent plaintiff seeks to cancel the notice of trustee's sale and trustee's deed upon sale, the complaint suffers from another fundamental defect. The complaint alleges Citibank was the purchaser at the foreclosure sale. Yet the operative complaint does not name Citibank as a defendant. Assuming Citibank is still the record owner of the property, it is an indispensable party to any action seeking to cancel the deed by which it acquired the property. "'The controlling test for determining whether a person is an indispensable party is, "Where the plaintiff seeks some type of affirmative relief which, if granted, would injure or affect the interest of a third person not joined, that third person is an indispensable party. [Citation.]" [Citation.] More recently, the same rule is stated, "A person is an indispensable party if his or her rights must necessarily be affected by the judgment."'" (*Tracy Press, Inc. v. Superior Court*, (2008) 164 Cal.App.4th 1290, 1298.) Here, if the trustee's deed upon sale is cancelled, Citibank's interest in the property is injured; thus it is an indispensable party.

However, because defendants did not assert a misjoinder of parties as a ground for their demurrer, either in the trial court or here, and in fairness to plaintiff, leave to amend should be granted to add Citibank as a defendant if warranted. Perhaps a bona fide purchaser has since acquired the property, and cancellation of the trustee's deed is no longer a viable option. (See Civ. Code, § 2924, subd. (c) ["A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law . . . shall constitute . . . conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice"].) Or perhaps the statute of limitations

23

has run as to Citibank. We do not address these questions as the record does not disclose the present ownership of the property, nor have the parties briefed whether amendment is possible. We merely grant plaintiff leave to amend if he is able to do so.

*Defendants Wells Fargo and Nationstar*

Plaintiff has not alleged any facts upon which defendants Wells Fargo or Nationstar could be held liable. Wells Fargo is alleged to be the master servicer, trust administrator, and custodian of the certificate holders for the securitized trust. Because we hold plaintiff has no standing to challenge the securitization of his note, and because Wells Fargo played no role in the foreclosure of the subject property, Wells Fargo cannot be liable. Nationstar took over the servicing of the note for Bank of America sometime after the events alleged in the complaint took place. There is no indication that Nationstar played any role in the foreclosure, nor that it accepted liability for Bank of America's earlier actions. Accordingly, we affirm the dismissal as to Wells Fargo and Nationstar.

DISPOSITION

The judgment of dismissal is reversed as to plaintiff's fifth cause of action against Bank of America for violation of the UCL. The order denying leave to amend as to plaintiff's first cause of action for wrongful foreclosure against Bank of America and the sixth cause of action for cancellation of the notice of sale and the trustee's deed upon sale are reversed. In all other respects, the judgment is affirmed. The matter is remanded for further proceedings consistent with this opinion. Plaintiff shall recover his costs incurred on appeal.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

ARONSON, J.

25

Filed 1/14/16

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KAZEM MAJD,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>    Defendants and Respondents. | G050250<br><br>(Super. Ct. No. 30-2012-00603633)<br><br>ORDER GRANTING PARTIAL PUBLICATION; MODIFICATION OF OPINION; NO CHANGE IN JUDGMENT |

United Law Center has requested that our opinion, filed on December 21, 2015, be certified for publication. It appears that portions of our opinion meet the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED for partial publication pursuant to rule 8.1110. This opinion is to be published in full with the exception of the entire section entitled *Plaintiff Lacks Standing to Assert Defects in the Securitization of His Loan* under the DISCUSSION part of the opinion commencing on page 6 and ending on page 11 of the opinion.

It is further ordered that the opinion be modified as follows:

On page 12, first full paragraph beginning with "We conclude, however, that plaintiff's" delete ",however," so that the paragraph begins with "We conclude that plaintiff's second theory of liability . . . ."

There is no change in the judgment.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.

2