Filed 6/7/21  Bundick v. Penny Mac Loan Services CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RUSSELL A. BUNDICK, | C079577 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201300146654CUORGDS) |
| v. | |
| PENNY MAC LOAN SERVICES LLC, | |
| Defendant and Respondent. | |

Plaintiff filed this action after losing his home to foreclosure.  Plaintiff took out a first and second deed of trust to finance the purchase of real property.  He subsequently refinanced, consolidating the debt into a single loan, and then he refinanced again.  Eventually, servicing of plaintiff's loan was transferred to defendant Penny Mac Loan Services LLC (Penny Mac).  Plaintiff fell two months behind on his loan.  Plaintiff alleged that Penny Mac refused to accept his payments to make the loan current.

1

Thereafter, he submitted a loan modification application, which was denied. He subsequently submitted another loan modification application. Although plaintiff never alleged Penny Mac agreed to consider his second loan modification application, he alleged this second request remained pending when his home was sold at a trustee's foreclosure sale to former codefendant DEG Equities, LLC (DEG). Plaintiff commenced this action and subsequently filed first and second amended complaints. Plaintiff asserted causes of action premised on wrongful foreclosure, negligence, and breach of the implied covenant of good faith and fair dealing. The trial court sustained Penny Mac's demurrers to the original complaint, the first amended complaint, and the second amended complaint. Plaintiff filed a third amended complaint asserting a single cause of action against Penny Mac premised on its alleged breach of the implied covenant of good faith and fair dealing. The trial court sustained Penny Mac's demurrer, this time without leave to amend.

In his appellate briefing, plaintiff asserts that: (1) he sufficiently pleaded a cause of action for wrongful foreclosure in his first amended complaint; (2) he sufficiently pleaded a cause of action premised on negligence in his first amended complaint; (3) he sufficiently pleaded the cause of action in his third amended complaint premised on Penny Mac's alleged breach of the implied covenant of good faith and fair dealing; and (4) if he cannot state a cause of action based on breach of the implied covenant of good faith and fair dealing, he should be granted leave to amend to assert a cause of action for intentional interference with contract.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

In July 2001, plaintiff purchased real property in Elk Grove which served as his primary residence. He took out a first and second deed of trust to finance the property. Approximately one year later, plaintiff refinanced, consolidating the debt into a single loan, and he refinanced again in 2006.

On June 15, 2010, Penny Mac issued a letter to plaintiff informing him that his loan had been transferred to Penny Mac. Plaintiff alleged that he continued to make monthly payments to the former loan servicer through October 10, 2010. The third amended complaint does not explain why he continued to make payments to the former loan servicer after Penny Mac's June 15, 2010, letter.[2] Plaintiff alleged that, in a letter dated July 9, 2010, Penny Mac stated he was delinquent in the amount of $6,439, which amounted to two months plus fees. Plaintiff alleged "[o]n information and belief, [he] was not delinquent as stated in said July 9, 2010 letter." On or about October 2010, Penny Mac threatened to foreclose. Plaintiff alleged that after receiving a demand for

---

[1] The factual allegations are taken from the third amended complaint, which is the operative complaint.

[2] In his original complaint, plaintiff did not mention the letter dated June 15, 2010. He alleged the loan servicing was transferred to Penny Mac in "early 2010" and that "[he] was never notified of this fact by [the former loan servicer] and therefore continued to make his $2,300 per month mortgage payment to them until October, 2010, at which point he learned that Penny Mac was initiating foreclosure proceedings in that they had not been paid since taking over the servicing of his mortgage." The letter was one of the subjects of Penny Mac's request for judicial notice in support of its demurrer to the third amended complaint. The first two paragraphs of the letter read: "Congratulations! [¶] Your home loan has been transferred to PennyMac Loan Services, LLC (PennyMac). This letter serves as your official notification of the transfer, which is effective July 1, 2010 as well as welcome to the PennyMac family." The penultimate paragraph references "a quick start guide" included with the letter that outlines the next steps plaintiff should take. In large bold print, the first item on the quick start guide reads: "Start sending your loan payments to PennyMac" and provides the address.

payment of $14,000, which he did not owe, he paid Penny Mac $14,050. He alleged the payment later appeared in the December 2010 statement, showing his account current. Subsequently, plaintiff's mother needed financial help and plaintiff provided assistance. As a result of using money to help his mother, plaintiff fell two months behind in his payments to Penny Mac. According to plaintiff, "by November 19, 2011, he had saved enough to catch up those two past due months and called Penny Mac to make the payment . . . ." Plaintiff alleged that, during the phone call, an unnamed person told him: "they would not accept his payment and that 'we don't want your money, we want your house, we will stop taking your payments and after you fall far enough behind we will foreclose on your home.' " Plaintiff did not allege he sent Penny Mac these payments.

Plaintiff alleged he submitted a Home Affordable Modification Program (HAMP) modification request to Penny Mac in January 2012, which was denied on an unspecified date.[3] A notice of default was recorded on May 11, 2012. Plaintiff did not allege he attempted to cure the default by paying or attempting to pay all of his past due payments.

Plaintiff alleged that in July 2012, he learned he could resubmit a loan modification request under the new HAMP Tier II program and he submitted an application that month. Plaintiff did not allege that he learned about the HAMP II program from Penny Mac. Nor did he allege Penny Mac accepted and agreed to consider this second application for loan modification. According to plaintiff, his "request" was still "pending" when his property was sold at a trustee's foreclosure sale on November

---

[3] " '[T]he United States Department of the Treasury implemented [HAMP] to help homeowners avoid foreclosure during the housing market crisis of 2008. "The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt." ' " (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 56, fn. 1 (*Lueras*).)

4

28, 2012. He alleged he was never notified the second loan modification application had been denied.

Plaintiff commenced this action against Penny Mac, among others. In the first cause of action, for breach of the implied covenant of good faith and fair dealing, plaintiff asserted that he and Penny Mac were in privity of contract and owed each other an obligation of good faith and fair dealing. Plaintiff asserted that Penny Mac breached that obligation by "mishandling" his HAMP Tier II loan modification application, delaying action on his request, proceeding with the foreclosure sale without resolving this second loan modification request, failing to give him notice of the sale, and improperly foreclosing during the pendency of his second loan modification request.

In the second cause of action, plaintiff asserted that Penny Mac caused an illegal foreclosure of his real property in violation of Civil Code section 2923.6.

Penny Mac filed a demurrer to the complaint. In opposition to the demurrer, plaintiff's attorney stated that, after reviewing the demurrer, counsel "has determined that the best course of action to take on behalf of Plaintiff is to voluntarily amend the existing Complaint. This will allow . . . the restatement of Plaintiff's complaints against Penny Mac taking into consideration the points raised in their current demurrer."[4] Plaintiff stated his intention to file a first amended complaint prior to the hearing on Penny Mac's demurrer.

Plaintiff filed a first amended complaint on March 13, 2014, four calendar days before the hearing date on Penny Mac's demurrer. In the first cause of action, plaintiff reasserted the cause of action for breach of the implied covenant of good faith and fair

---

[4] Penny Mac had pointed out that the provisions of Civil Code section 2923.6 that would have supported plaintiff's cause of action for wrongful foreclosure were not in effect at the relevant times. (See Civ. Code, § 2923.6, as amended by Stats. 2012, ch. 87, § 7.) Faced with this reality, plaintiff abandoned this statutory cause of action in later amendments.

5

dealing. In the second cause of action, plaintiff asserted that Penny Mac breached its duty pursuant to relevant banking regulations to administer and consider plaintiff's loan modification request "and deny it properly" prior to proceeding to finalize foreclosure by purposefully completing an "invalid and wrongful foreclosure of the Deed of Trust during the pendency of the loan modification request." Plaintiff did not cite any specific banking regulations. Plaintiff further asserted that the foreclosure was wrongful "as a result of [Penny Mac's] refusal to allow Plaintiff to reinstate his two month delinquent real estate loan and as a result of its failure to properly process and consider his loan modification request prior to foreclosing including but not limited to [its] failure to give notice of their intention to proceed with their foreclosure sale despite the pendency of the loan modification request or give notice of the intended sale date." In a third cause of action, sounding in negligence, plaintiff asserted that Penny Mac had a duty to exercise due care in servicing the loan, in "its reinstating of his delinquent real estate," in processing plaintiff's loan modification request, and in handling the foreclosure of plaintiff's property. Plaintiff asserted that Penny Mac breached its duty by refusing to reinstate plaintiff's delinquent loan, in negligently processing plaintiff's loan modification application, and in completing the foreclosure sale during the pendency of plaintiff's loan modification request.

In a tentative ruling, the trial court characterized Penny Mac's demurrer to the original complaint as unopposed and sustained the demurrer. The trial court noted that plaintiff filed what plaintiff called an opposition to the demurrer, but, according to the court, plaintiff's opposition "did not respond to the substance of the demurrer, which is construed as plaintiff's concession of the merits of [Penny Mac's] demurrer." The trial court stated: "Since this is the first challenge to the complaint, leave to amend is granted." The court did not state any limitation to amendments. The trial court affirmed the tentative ruling.

6

Thereafter, Penny Mac filed a demurrer to plaintiff's first amended complaint. In a tentative ruling, which the court later confirmed after a hearing, the trial court sustained the demurrer. The court noted that the allegations asserted against Penny Mac in the first amended complaint were "almost identical to those in the original complaint."

The trial court rejected Penny Mac's contention that, because DEG prevailed in its unlawful detainer action against plaintiff, his claims challenging the validity of the sale of his home were barred. The trial court concluded: "Because it is unclear whether PennyMac even argues that res judicata and collateral estoppel dispose of an entire cause of action, the court will not sustain any demurrer based on those doctrines."

However, the trial court sustained the demurrer as to the first cause of action, for breach of the implied covenant of good faith and fair dealing. The court concluded that plaintiff's allegations were insufficient to state a cause of action because he failed to allege any facts establishing the existence of a contractual relationship between plaintiff and Penny Mac upon which the cause of action could be based. The court granted leave to amend because plaintiff asserted he could remedy the defect by alleging an implied contractual relationship.

The court sustained the demurrer to the second cause of action for wrongful foreclosure. The court stated: "When the court granted [plaintiff] leave to amend the complaint, it did not grant leave to add new causes of action, including the second cause of action for wrongful disclosure. If [plaintiff] wishes to add this or any other new cause of action, he must do so after obtaining leave to amend pursuant to CRC 3.1324. Because [plaintiff] did not move for or obtain leave of court to add his second cause of action to the [first amended complaint], this cause of action is not properly before the court." Later in the minute order, the court stated: "[Plaintiff] may file and serve an SAC in an effort to remedy the defects in his first cause of action for breach of the implied covenant of good faith and fair dealing. [Plaintiff] may not add new causes of

7

action until such time as the court grants a proper motion for leave to amend pursuant to CRC 3.1324."

The trial court sustained the demurrer as to the third cause of action, sounding in negligence, without leave to amend. The court noted that loan servicers generally do not owe borrowers a duty of care that could support a negligence cause of action. The court further stated that, while such a duty of care could arise, plaintiff did not allege that Penny Mac went beyond its traditional role as a loan servicer, and he did not contend that he could allege such facts.

Plaintiff filed a second amended complaint containing a single cause of action for breach of the implied covenant of good faith and fair dealing. Prior to doing so, he did not seek leave to add a cause of action for wrongful foreclosure; nor did he argue he should have been allowed to do so without leave of the court prior to the date scheduled for the hearing on the first demurrer.

In the second amended complaint, plaintiff alleged that he and Penny Mac commenced a course of conduct "which resulted in an implied contract between them whereby [Penny Mac] took over mortgage loan servicing and loan modification processing of Plaintiff's home loan from American Home Mortgage Servicing, Inc. and Plaintiff began intrusting [Penny Mac] with his home loan payments and the processing of his loan modification requests." Plaintiff asserted that he and Penny Mac were in privity of contract, and therefore had an ongoing implied obligation of good faith and fair dealing to each other. Plaintiff asserted that Penny Mac breached that implied obligation "as a result of their refusal to accept his reinstatement payment and their purposeful mishandling of his HAMP Tier II loan modification request including, but not limited to: delaying action on his loan modification request, proceeding with their foreclosure sale without first denying his loan modification, failing to give him proper notice of the Notice of Trustee's Sale and as a result of their invalid and wrongful foreclosure of the Deed of Trust during the pendency of his loan modification in violation of law."

8

Again, Penny Mac filed a demurrer. Penny Mac asserted there was no contractual relationship between it and plaintiff because the only contract involved was the loan agreement, to which Penny Mac was not a party. Because there was no contractual relationship, plaintiff could not assert a cause of action premised on breach of the implied covenant of good faith and fair dealing. Penny Mac further asserted that there were no facts to support the existence of an implied contract. Further, Penny Mac asserted that plaintiff failed to allege facts to show the existence of any breach. Penny Mac asserted that it was under no legal or contractual duty to modify plaintiff's loan, and that plaintiff lacked standing to allege noncompliance with HAMP guidelines. Penny Mac also emphasized that plaintiff had filed three bankruptcy petitions in an effort to undo the foreclosure sale, and that DEG, the entity that purchased the home at foreclosure, obtained an unlawful detainer judgment against plaintiff which, according to Penny Mac, collaterally estopped plaintiff from asserting his claims.

In a tentative ruling, the trial court sustained Penny Mac's demurrer without leave to amend. The trial court concluded that plaintiff failed to adequately plead the existence of an implied contract, and therefore failed to plead a sufficient contractual basis for the remaining cause of action. The trial court stated that plaintiff "has pled only that PennyMac serviced his loan pursuant to the servicing agreement between PennyMac and [plaintiff's] lender. [Plaintiff] alleges no facts indicating that he provided any consideration to PennyMac or that PennyMac benefited from [plaintiff's] actions. Moreover, courts have held that a servicing agreement between a mortgage beneficiary and a servicer is not a contract to which the borrower is a party." Based on this reasoning, the trial court concluded that plaintiff failed to adequately plead the existence of an implied contract, and thus the cause of action failed.

The trial court also noted that plaintiff sought a judgment ordering Penny Mac to repurchase the subject property, return title to plaintiff, and reinstate and modify his loan. The court stated that the tender rule required as a precondition to challenging a

9

nonjudicial foreclosure sale that the borrower make a valid and viable tender of payment, and the absence of an allegation of ability to tender is fatal to a cause of action seeking to challenge or prevent a nonjudicial foreclosure sale. Additionally, to effect rescission or cancellation, tender was required. The court stated that plaintiff's failure to allege that he tendered the debt also rendered plaintiff's cause of action fatally deficient. The court stated that plaintiff failed to demonstrate the likelihood that he could amend the complaint to cure the defects, and, accordingly, the trial court in the tentative ruling sustained the demurrer without leave to amend.

After the tentative ruling, the matter was argued and submitted and the trial court affirmed its tentative ruling. However, it modified that ruling to again grant leave to amend.

Plaintiff filed his third amended complaint which, like the second amended complaint, asserted a single cause of action for breach of the implied covenant of good faith and fair dealing. In addition to reasserting the factual basis for his claims, plaintiff asserted that the "contract on which this cause of action . . . is based [is] the direct written Note and Deed of Trust which as alleged herein was transferred to Penny Mac Trust and then to Penny Mac or in the alternative Penny Mac was acting as the agent of Penny Mac Trust with regards to the acts stated herein." Plaintiff further asserted that Penny Mac breached the implied covenant of good faith and fair dealing when it refused to allow plaintiff to cure his two-month arrearage, and when it proceeded to foreclose despite plaintiff's willingness to cure the arrearage and despite the fact that his loan modification application remained pending. Plaintiff further asserted that Penny Mac failed to credit payments, failed to accept cure payments, and failed to modify the loan in good faith. Plaintiff asserted that, while generally a party to a contract must perform or make an offer of performance to hold the other party liable for a breach, no tender is required if it would be futile. Plaintiff also repeated the allegations set forth in the second amended

10

complaint concerning Penny Mac's alleged purposeful mishandling of plaintiff's HAMP Tier II loan modification application.

Penny Mac once again demurred.[5]  Penny Mac asserted that, rather than attempt to set forth facts sufficient to establish the existence of an implied contract, plaintiff "reverses course from his prior pleadings and representations, abandoning his implied contract allegations in favor of re-asserting his previously-dismissed contention that this mortgage servicer PennyMac breached his written loan contract (*i.e.* his promissory note and Deed of Trust) by wrongfully refusing his attempt to reinstate the loan following his conceded default, and later by foreclosing on the subject property."

Penny Mac asserted that plaintiff's cause of action remained deficient because: (1) Penny Mac was not a party to the mortgage loan agreement, but instead merely serviced the loan; (2) a servicing agreement between a mortgage beneficiary and a loan servicer is not a contract to which a borrower is a party upon which contract-based claims may be premised; (3) plaintiff's efforts to recharacterize his cause of action as one for breach of a written contract violated the trial court's prior orders, contradicted his own concession that there was no written contract between the parties, and gave rise to a " 'sham pleading' "; (4) plaintiff's contention that Penny Mac could be held liable as an agent for the nonparty beneficiary was belied by case law holding that an agent cannot be liable for breach of a duty flowing from a contract to which the agent is not a party; and

---

[5]  As it did with each of its demurrers, Penny Mac filed a request for judicial notice.  The items that were the subject of the request for judicial notice in connection with the third amended complaint included the July 21, 2006, deed of trust; a March 2012 assignment of the deed of trust; a June 2010 letter from Penny Mac to plaintiff notifying plaintiff the loan had been transferred to Penny Mac; the notice of default and election to sell under deed of trust; a substitution of trustee; a notice of trustee's sale; a trustee's deed upon sale; a home affordable modification agreement; dockets for three bankruptcy petitions filed by plaintiff; the complaint in DEG's unlawful detainer action against plaintiff; judgment in that action; and prior filings in this case.  The trial court granted Penny Mac's latest request for judicial notice as unopposed.

11

(5) the trial court already dismissed plaintiff's wrongful foreclosure claim which was based on " 'dual tracking,' " and, in any event, the statute on which the claim was premised was not effective in November 2012, when the foreclosure sale took place. Penny Mac reiterated its position that there was no contract between the parties to support a cause of action premised on breach of the implied covenant of good faith and fair dealing. Penny Mac also asserted that, not only did plaintiff fail to specifically identify a contract term that it breached, but plaintiff conceded his own nonperformance both by becoming delinquent by two payments and by making payments to the former servicer rather than to Penny Mac after Penny Mac became the loan servicer. Additionally, Penny Mac again asserted that, while plaintiff contended that it violated HAMP guidelines, plaintiff was not a party to any HAMP contract and he was not an intended beneficiary thereto.

In a tentative ruling, the trial court sustained Penny Mac's demurrer to the third amended complaint, without leave to amend. The court stated that plaintiff's new allegation that Penny Mac became the holder of the note rather than merely the loan servicer "constitutes a sham pleading in light of numerous repeated judicial admissions in plaintiff's own pleadings and filings." The court recited that plaintiff in the original complaint, the first amended complaint, and the second amended complaint identified Penny Mac as the loan servicer. The court also emphasized that, in opposition to Penny Mac's demurrers to the first and second amended complaints, plaintiff admitted that there was no written contract between the parties. Therefore, the trial court stated that "plaintiff cannot at this late stage of the pleadings ignore his multiple admissions that PennyMac was merely a loan servicer and had no written contract with plaintiff in an attempt to cure the defects in his complaint based on an allegation that PennyMac was the owner of the loan and thus, had a contract with plaintiff." As a result, the court stated that the third amended complaint failed to adequately plead the existence of any contract upon which a claim for breach of the implied covenant of good faith and fair dealing

12

could be premised. The court noted that plaintiff had attempted to plead his claims four times, and concluded that plaintiff had no "reasonable probability" of curing the defects in his pleadings. Accordingly, the trial court sustained the demurrer without leave to amend. Thereafter, the trial court adopted the tentative ruling and entered a judgment of dismissal.

## DISCUSSION

### I. Standard of Review and
### Law Pertaining to Amending Defective Complaints

A demurrer tests the sufficiency of the complaint as a matter of law, and it raises only questions of law. (Code Civ. Proc., § 589, subd. (a).)[6] "[I]n passing upon the question of the sufficiency or insufficiency of a complaint to state a cause of action, it is wholly beyond the scope of the inquiry to ascertain whether the facts stated are true or untrue. That is always the ultimate question to be determined by the evidence upon a trial of the questions of fact. Obviously, the complaint, when appropriately challenged, whether for want of sufficient facts or for an insufficient or inartificial statement of the facts, must stand or fall by its own force." (*Colm v. Francis* (1916) 30 Cal.App. 742, 752.) "We review a trial court's decision to sustain a demurrer for an abuse of discretion." (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1014, 1019 (*Zipperer*).) "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.] Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162 (*T.H.*); accord *Vanacore & Associates, Inc. v. Rosenfeld* (2016) 246 Cal.App.4th 438, 454 (*Vanacore*).) " ' "To

---

[6] Further undesignated statutory references are to the Code of Civil Procedure.

13

satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.]  The assertion of an abstract right to amend does not satisfy this burden." [Citation.]  The plaintiff must *clearly and specifically* state "the legal basis for amendment, i.e., the elements of the cause of action," as well as the "*factual allegations* that sufficiently state all required elements of that cause of action." ' " (*Vanacore,* at p. 454, italics added; accord, *Casiopea Bovet, LLC v. Chiang*, (2017) 12 Cal.App.5th 656, 664 (*Casiopea*); *People ex rel. Brown v. Powerex* (2007) 153 Cal.App.4th 93, 112 (*Brown*) [appellant has a "duty to spell out in his brief the specific proposed amendments on appeal"].)

## II.  Wrongful Foreclosure

### A.  Plaintiff's Contentions

Plaintiff asserts that the trial court erred in sustaining the demurrer to the first amended complaint without leave to amend as to the cause of action for wrongful foreclosure on the ground that plaintiff failed to seek leave to amend his complaint to add such a cause of action.  Plaintiff asserts that he filed his first amended complaint adding such a cause of action as a matter of right pursuant to section 472.  Plaintiff emphasizes that he submitted his first amended complaint prior to the trial court's ruling on Penny Mac's demurrer to the original complaint, substituting the wrongful foreclosure cause of action for the cause of action premised on Civil Code section 2923.6.  Plaintiff maintains that, contrary to the trial court's ruling, he was not required to seek leave to amend his original complaint to add this cause of action because, pursuant to the version of section 472 in effect at the time, he could amend his complaint once as a matter of right prior to the hearing on the pending demurrer.  Additionally, plaintiff emphasizes that the theories underlying the statutory cause of action in the original complaint and the wrongful foreclosure cause of action in the first amended complaint were nearly identical.  Plaintiff asserts that his cause of action is premised on the factual allegations that Penny Mac is

14

subject to unspecified federal banking regulations which required it to administer and consider his second loan modification application and act on it before proceeding to foreclosure and that the foreclosure was wrongful because Penny Mac:  (1) breached its duty by completing the foreclosure while his application remained pending; (2) refused to allow him to make two past-due payments and reinstate his loan; and (3) failed to inform plaintiff of its intent to proceed with foreclosure and also failed to provide notice of the sale date.

### B.  Filing of First Amended Complaint as of Right

The version of section 472 in effect at all relevant times here provides: "Any pleading may be amended once by the party of course, and without costs, at any time before the answer or demurrer is filed, *or after demurrer and before the trial of the issue of law thereon*, by filing the same as amended and serving a copy on the adverse party . . . ."  (Former § 472, italics added.)  Plaintiff filed his first amended complaint four calendar days before the hearing on Penny Mac's demurrer.  Thus, he filed the first amended complaint "before the trial of the issue of law" on that demurrer and consequently, the first amended complaint was filed as of right under the version of section 472 in effect at the time.  Therefore, we agree with plaintiff that the trial court erroneously sustained the demurrer without leave to amend as to the wrongful foreclosure cause of action on the ground that the cause of action was not properly before the court since the court had not granted plaintiff leave to amend his complaint to add new causes of action.

Accordingly, we will proceed to examine whether the wrongful foreclosure action was sufficiently pled in the amended complaint, and, if not, whether plaintiff should be allowed to amend and whether he has demonstrated he could cure any defects if granted leave to amend.  While the trial court did not reach these arguments, "[a] judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if

15

proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

## C. Sufficiency of Pleading for Wrongful Foreclosure

"A wrongful foreclosure is a common law tort claim. It is an equitable action to set aside a foreclosure sale, or an action for damages resulting from the sale, on the basis that the foreclosure was improper." (*Sciarratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552, 561 (*Sciarratta*), citing *Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408-409 (*Miles*).) "The elements of the tort of wrongful foreclosure are: ' "(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering" '; and (4) ' "no breach of condition or failure of performance existed on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale." ' " (*Majd v. Bank of America, N.A.* (2015) 243 Cal.App.4th 1293, 1306-1307 (*Majd*), quoting *Miles*, at p. 408.) "Expanding on the fourth element, . . . 'the *foreclosure must have been entirely unauthorized on the facts of the case.*' " (*Majd*, at p. 1307, quoting *Miles*, at p. 409, italics added.)

As plaintiff emphasizes, in the wrongful foreclosure cause of action in his first amended complaint, he pled: Penny Mac was subject to banking regulations; those banking regulations obligated Penny Mac to administer and consider plaintiff's loan modification application and act on it before foreclosing; Penny Mac breached its duty by completing the foreclosure sale while plaintiff's loan modification application remained pending; Penny Mac wrongfully refused to allow plaintiff to reinstate his loan by making two past-due payments; and Penny Mac wrongfully failed to inform plaintiff of its intent to proceed with foreclosure and to give him notice of the intended sale date.

16

With regard to the regulations alleged to be at issue, plaintiff asserts that Penny Mac improperly engaged in "dual tracking" in purported violation of the HAMP guidelines. "Dual tracking" refers to where a bank, lender, or similar institution "initiate[s] a loan modification review while simultaneously proceeding with foreclosure . . . ." (*Majd, supra*, 243 Cal.App.4th at p. 1302.) Discussing those HAMP guidelines, the *Majd* court stated: "[I]n 2010 the United States Department of the Treasury promulgated HAMP supplemental directive 10-02, which states, '*A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale <u>unless</u> and <u>until</u> at least one of the following circumstances exists:  [¶]  The borrower is evaluated for HAMP and is determined to be ineligible for the program*.' [Citation.]  HAMP Supplemental Directive 10-02 also provides a 30-day foreclosure moratorium following denial of a modification to permit borrowers to respond to the denial.  'The servicer may not conduct a foreclosure sale within the 30 calendar days after the date of a 'Non-Approval Notice' or any longer period required to review supplemental material provided by the borrower in response to a Non-Approval Notice unless the reason for the non-approval is' based on factors not pertinent here.  [Citation.]  In other words, the servicer cannot foreclose until at least 30 days after the loan modification review is completed." (*Majd*, at p. 1302, italics added.)

In *Majd*, the court concluded that the plaintiff's "theory of liability—that foreclosure was improper during the modification review process—is a viable theory on which to base causes of action for . . . wrongful foreclosure . . . ." (*Majd, supra*, 243 Cal.App.4th at p. 1300.)  Discussing the plaintiff's wrongful foreclosure cause of action, the *Majd* court listed the elements of such a cause of action set forth *ante*, and then stated: "Tracking these elements, plaintiff alleged the foreclosure was in breach of Bank of America's legal obligations and that his modification was denied on a false claim that he failed to produce all required documentation.  As we explained above, plaintiff alleged prejudice in that he may have been able to avoid the foreclosure had Bank of America

17

completed the modification review process in good faith. Plaintiff was excused from tendering. And, under the facts as alleged, foreclosure was not authorized." (*Id*. at p. 1307.)

Here, with regard to the first element, plaintiff was required to allege that Penny Mac "caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust . . . ." (*Sciarratta, supra*, 247 Cal.App.4th at p. 561-562.) As in *Majd*, plaintiff here alleges "the foreclosure was in breach of [Penny Mac's] legal obligations" under the HAMP guidelines prohibiting foreclosure while a HAMP modification is pending. (*Majd, supra*, 243 Cal.App.4th at p. 1307.)

But, as noted *ante*, the Treasury Guidelines specify that a servicer may refer a loan to foreclosure or conduct a scheduled foreclosure sale after the borrower is evaluated for HAMP and is determined to be ineligible for the program. Based on Plaintiff's complaint, he was rejected for HAMP in connection with his first modification application. Plaintiff cites no HAMP rules that precludes foreclosure during a second or subsequent request for modification under HAMP.

Moreover, plaintiff alleged no facts establishing that Penny Mac actually initiated a second loan modification review. He alleged only the following: "A complete HAMP Tier II loan modification request was still pending, had never been denied in writing or otherwise and Plaintiff was continuing to have periodic contact with PennyMac, by and through his representative, regarding the loan modification all the way up to and after the illegal trustee's sale as he continue[d] his efforts to have this illegal trustee's sale set aside voluntarily." Conspicuously absent from the complaint is any allegation that, after he requested review, Penny Mac agreed to consider his second application, was considering it, or was otherwise obligated to consider it. "Dual tracking" occurs when a bank, lender, or similar institution "*initiate*[*s*] a loan modification review while simultaneously proceeding with foreclosure . . . ." (*Majd, supra*, 243 Cal.App.4th at

18

p. 1302, italics added.)  Plaintiff alleged insufficient facts to support the claim Penny Mac violated unspecified regulations related to HAMP.

Remaining is plaintiff's claim pertaining to the alleged November 2011 phone call in which Penny Mac refused to allow him to cure his two-month delinquency.  Plaintiff does not allege how much was owing when the notice of default was filed in May 2012.  " ' "A plaintiff in a suit for wrongful foreclosure has generally been required to demonstrate the alleged imperfection in the foreclosure process was prejudicial to the plaintiff's interests." ' . . .  ' "Prejudice is not presumed from 'mere irregularities' in the process." ' " (*Kalnoki v. First American Trustee Servicing Solutions, LLC* (2017) 8 Cal.App.5th 23, 48.)  As Penny Mac asserts,  plaintiff has failed to allege that " ' "no breach of condition or failure of performance existed on [plaintiff's] part which would have authorized the foreclosure or exercise of the power of sale." ' " (*Majd, supra*, 243 Cal.App.4th at p. 1307, quoting *Miles, supra*, 236 Cal.App.4th at p. 408.)  Nor has plaintiff sufficiently alleged facts establishing that the foreclosure was " 'entirely unauthorized on the facts of the case.' " (*Majd*, at p. 1307, quoting *Miles*, at p. 409.)

In his reply brief, plaintiff asserts that Penny Mac's alleged "refusal to accept [plaintiff's] offer to cure his default in November 2011" by tendering his two past-due payments "prejudiced [plaintiff] at that very moment."  However, even accepting plaintiff's allegations as true at this stage, and even accepting the implication that Penny Mac's refusal occurring six months before the notice of default was filed is connected to the foreclosure which took place a full year after the refusal, the allegations still do not establish or allege that " ' "no breach of condition or failure of performance existed on [plaintiff's] part which would have authorized the foreclosure or exercise of the power of sale" ' " (*Majd, supra*, 243 Cal.App.4th at p. 1307, quoting *Miles, supra*, 236 Cal.App.4th at p. 408), or that Penny Mac's foreclosure was " 'entirely unauthorized on

19

the facts of the case.' "[7]  (*Majd*, at p. 1307, quoting *Miles*, at p. 409.)  Plaintiff was obligated to make payments and nothing in his complaint alleges he did or actually attempted to do so.

As for his other theory concerning conduct prohibited by HAMP regulations, addressed to foreclosure occurring while plaintiff was still being reviewed for a loan modification, for the same reasons stated *ante*, we conclude that this allegation is inadequate to sufficiently allege prejudice.  Additionally, plaintiff's claim concerning lack of notice of the sale date also fails to sufficiently allege prejudice.

Accordingly, we conclude that plaintiff failed to sufficiently state a wrongful foreclosure cause of action.

### D.  Leave to Amend

In his original briefing, plaintiff asserted that he could cure any defect in the pleading through amendment and emphasized that the trial court dismissed the cause of action on flawed procedural grounds.  After we granted defendant's motion to file supplemental briefing to address *Sheen v. Wells Fargo Bank, N.A*., (2019) 38 Cal.App.5th 346, review granted, Nov. 13, 2019, S258019, and *Weimer v. Nationstar Mortgage, LLC* (2020) 47 Cal.App.5th 341, 358 (*Weimer*), review granted, July 22, 2020, S262024,

---

[7] We also note here that plaintiff does not assert in his complaint that he took any steps to attempt to cure his default or bring his loan current other than speaking with the one person in November 2011 who told him " 'we don't want your money . . . .' "  Plaintiff did not allege that he actually submitted or attempted to submit payment in another manner or that he attempted to speak with someone else at Penny Mac.  Nor does he allege he tried to cure his default after the notice of default was recorded on May 11, 2012, even though the notice of default is required to inform a borrower about the *right* of reinstatement with the following language:  "[Y]ou may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account . . ."  (Civ. Code, § 2924c, subd. (b)(1).)  Plaintiff did not allege the notice of default did not include this mandatory language.

plaintiff filed a response in which he further asserted he can cure by additional amendments.

"We . . . review a trial court's denial of leave to amend for an abuse of discretion. [Citation.] 'As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend.' [Citations.] 'Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result.' " (*Zipperer, supra*, 133 Cal.App.4th at p. 1020.)

First, we note that the trial court did not flatly prohibit plaintiff from amending to add a wrongful foreclosure cause of action. True, it erroneously ruled plaintiff had to seek leave to so amend, but it did not prohibit him from seeking leave to do so. Plaintiff never did, even though he filed two subsequent amended complaints. " 'When a demurrer is sustained with leave to amend, and the plaintiff chooses not to amend but to *stand on the complaint*, an appeal from the ensuing dismissal order may challenge the validity of the intermediate ruling sustaining the demurrer.' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232, italics added.) The same rule should apply here, where seeking amendment was not foreclosed and the court expressly raised the possibility of amendment pursuant to California Rules of Court, rule 3.1324, but plaintiff did not attempt to amend. Plaintiff here must "stand on the complaint" and cannot ask an appellate court to allow amendments it could have requested of the trial court. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091 (*Reynolds*) [" 'It is the rule that when a plaintiff is given the opportunity to amend his complaint and elects not to do so, strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as he can' "]; *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1372 (*Alfaro*) ["When plaintiffs decline an

21

invitation to amend a cause of action, on appeal we assume that the complaint contains their strongest statement of that cause of action"].)

Second, even if plaintiff would be entitled to offer amendments, he has failed to make any showing that he has the ability to assert a meritorious wrongful foreclosure cause of action. He did not offer anything in his original or supplemental briefing to establish that Penny Mac actually accepted his second modification application for review and initiated a second loan modification review. Nor has he offered any facts that would establish " ' "no breach of condition or failure of performance existed on [plaintiff's] part which would have authorized the foreclosure or exercise of the power of sale." ' " (*Majd, supra*, 243 Cal.App.4th at p. 1307, quoting *Miles, supra*, 236 Cal.App.4th at p. 408.)

As noted, plaintiff belatedly further sought leave to amend in his supplemental briefing we ordered pursuant to Penny Mac's request related to the negligence cause of action. But even that request was inadequate. In responding to Penny Mac's assertion in its supplemental brief that plaintiff "does not allege that PennyMac agreed to undertake a loan modification review for his benefit and in doing so mishandled his application," plaintiff asserted, as he did in the third amended complaint, that he learned in July 2012 that he could resubmit a loan modification request under HAMP Tier II and submitted a new loan modification request on July 12. After having made multiple amendments in the trial court, he said in his supplemental briefing: "If there is any doubt as alleged in the briefs that it was [Penny Mac] who told him he could resubmit for a loan modification that is easily curable by an amendment that he 'learned' of that from [Penny Mac]." But this vague assertion falls far short of plaintiff's obligation to "spell out in his [supplemental] brief the specific proposed amendments" (*Brown*, *supra*, 153 Cal.App.4th at p. 112), and "specifically state" the "factual allegations" to support his claim (*Vanacore*, *supra*, 246 Cal.App.4th at p. 454).

22

Indeed, plaintiff did not assert in his supplemental briefing that Penny Mac actually initiated a second modification review. He skirted this important fact again later in his supplemental briefing, stating: "As alleged in the lawsuit the loan modification application was solicited *or* accepted for review by the lender/servicer, it is a complete application, has not been denied, and was still pending decision at the time of the foreclosure sale. Any lack of clarity on these allegations with dates or exactly what was submitted that make it a complete application, or the circumstance of the solicitation to submit a modification application, that this Court might find is required to state a cause of action the Complaint is amenable to so state." (Italics added.) We find it misleading to assert that the complaint alleged the "modification application was *solicited or accepted* for review." (Italics added.) It did not. Indeed, as we discuss *post*, in his original briefing, plaintiff stated "Penny Mac *seemingly agreed* to review [plaintiff] for a loan modification." And the assertion in his supplemental briefing that plaintiff could make things right by alleging whatever this court deems must be alleged turns the pleading process on its head. It is plaintiff that must assert in his briefing the specific factual allegations supporting his cause of action. (*T.H.*, *supra*, 4 Cal.5th at p. 162; *Vanacore*, *supra*, 246 Cal.App.4th at p. 454; *Casiopea*, *supra*, 12 Cal.App.5th at p. 664; *Brown*, *supra*, 153 Cal.App.4th at p. 112 [vague claim that the court's "concerns" "could be 'address[ed]' by an amendment . . . does not satisfy an appellant's duty to spell out in his brief the specific proposed amendments on appeal"].)

Finally, at oral argument, counsel for plaintiff conceded the wrongful foreclosure cause of action was not adequately pled and amendments are required. Counsel maintained that, based on documents his client had "submitted to Penny Mac," he could allege that plaintiff submitted the second modification application, that it was a complete application, and that it was accepted for review by Penny Mac. It is not clear how documents plaintiff submitted to Penny Mac would support an allegation that Penny Mac actually accepted his second application for review. Nonetheless, even assuming these

belated, seemingly conclusory allegations are sufficient to establish Penny Mac accepted his second modification for review and was purportedly reviewing it, they come far too late. New issues cannot be raised for the first time in oral argument. (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co*. (1992) 7 Cal.App.4th 1088, 1098 ["new issues cannot generally be raised for the first time in oral argument"].) Indeed, we generally do not consider arguments made for the first time even in a reply brief, because " '[o]bvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it . . . . Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764, quoting *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.) Thus, where a plaintiff fails to show how the complaint can be amended in their opening brief, we may properly regard any belated proposed amendments as forfeited. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52, 56 [rejecting points raised for the first time on appeal without good cause in reviewing trial court's ruling sustaining a demurrer without leave to amend].)

We do that here where at no time during the pendency of the appeal did plaintiff seek leave to file a supplemental brief to state specific factual allegations he could make if granted leave to amend and only made an insufficient attempt to do so in writing after supplemental briefing was requested by Penny Mac on a different issue. Consequently, we reject plaintiff's belated claim that he could amend his complaint to allege that Penny Mac actually accepted his second loan modification for review. Additionally, even at oral argument, plaintiff did not offer any facts that would establish " ' "no breach of condition or failure of performance existed on [plaintiff's] part which would have authorized the foreclosure or exercise of the power of sale" ' " (*Majd, supra*, 243

24

Cal.App.4th at p. 1307, quoting *Miles, supra*, 236 Cal.App.4th at p. 408), yet another shortcoming of his complaint.

We conclude that, even if plaintiff was not required to stand on the wrongful foreclosure cause of action as set forth in the first amended complaint, he has not shown a reasonable possibility he can cure the defects in his pleadings with amendment. Accordingly, we conclude the demurrer was properly sustained without leave to amend as to this cause of action.[8]

### III. Negligence[9]

### A. Plaintiff's Contentions

Plaintiff asserts that the trial court erred in sustaining the demurrer to the first amended complaint without leave to amend as to the cause of action sounding in negligence. Plaintiff asserts that he alleged that Penny Mac assumed a duty of care to him by: "(1) servicing the Subject Loan, (2) reinstating [plaintiff's] delinquency, (3) processing and considering his loan modification request, and (4) handling the foreclosure."[10]

### B. Negligence Elements and the Allegations in the First Amended Complaint

---

[8] Given our conclusion, we need not address Penny Mac's contention that the wrongful foreclosure cause of action is barred by collateral estoppel based on DEG's successful unlawful detainer action against plaintiff.

[9] We note, as emphasized by plaintiff, that while the negligence cause of action, like the wrongful foreclosure cause of action, was newly asserted in the first amended complaint, the trial court considered the merits of the demurrer relative to the negligence cause of action while it declined to do so relative to the wrongful foreclosure cause of action.

[10] In his appellate briefing, plaintiff stated the intent to confine his arguments to the first three issues.

Plaintiff asserts that the first amended complaint alleged that Penny Mac "had a duty to exercise due care by accepting his monthly payments and allowing him to cure any arrearages to bring his loan current, and to act reasonably in the loan modification process." Plaintiff maintains that Penny Mac breached the duty it owed him by refusing to allow him to reinstate his loan and when it foreclosed on the subject property while his loan modification application remained under review.

To support a negligence cause of action, a plaintiff must plead that the defendant owed the plaintiff a legal duty, the defendant breached the duty, and that the breach was a proximate or legal cause of the plaintiff's injuries. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477.) "We start by identifying the allegedly negligent conduct by [Penny Mac] because our analysis is limited to 'the specific action the plaintiff claims the particular [defendant] had a duty to undertake in the particular case.' " (*Lueras, supra*, 221 Cal.App.4th at p. 62, quoting *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 280; accord, *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 944 (*Alvarez*).)

Relevant to his negligence cause of action, plaintiff asserted in the first amended complaint that, having previously depleted his savings when his mother needed financial assistance, he fell two months behind on his mortgage payments. When he had saved up enough money to pay the arrears, he contacted Penny Mac in November 2011, but was told by an unnamed person "they would not accept his payment and that 'we don't want your money, we want your house, we will stop taking your payments and after you fall far enough behind we will foreclose on your home.' " This occurred before plaintiff submitted any application for modification.

In December 2011, plaintiff "began the process of seeking a loan modification and submitted a HAMP modification request in January 2012." Plaintiff's request was denied on some unspecified date, and a notice of default was recorded in May 2012. Plaintiff

26

asserted no allegations attempting to establish that Penny Mac's consideration of this loan modification application was mishandled.

In July 2012, plaintiff learned that he could submit a HAMP Tier II loan modification request, and, through a paralegal, he did so. He did not assert that he learned about HAMP Tier II from Penny Mac. According to plaintiff, "A complete HAMP Tier II loan modification request was still pending, had never been denied in writing or otherwise and Plaintiff was continuing to have periodic contact with PennyMac, by and through his representative, regarding the loan modification all the way up to and after the illegal trustee's sale as he continue[d] his efforts to have this illegal trustee's sale set aside voluntarily. At no time prior to Penny Mac's sale of his house on November 28, 2012 was Plaintiff . . . ever advised . . . that the open pending loan modification had been denied."

In the body of the negligence cause of action, plaintiff asserted that, "Penny Mac had a duty to Plaintiff to exercise due care in its servicing of his real estate loan, in its reinstating of his delinquent real estate; in its processing and consideration of his loan modification request and in its handling of their foreclosure of his home loan." Plaintiff asserted that Penny Mac breached its duty "as a result of their refusal to reinstate his delinquent real estate loan, their negligent processing of his loan modification application and their completion of their invalid and wrongful foreclosure of the Deed of Trust during the pendency of the loan modification request . . . ."

### C. Analysis

#### 1. Conventional Money Lending Role and *Biakanja*

"Whether a duty of care exists is a question of law to be determined on a case-by-case basis." (*Lueras, supra*, 221 Cal.App.4th at p. 62.) "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089,

1096.)  In those cases where the institution's involvement may fall outside the "general rule," we engage in a balancing of factors set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*).  (*Nymark*, at p. 1098.)  Setting forth these *Biakanja* factors, this court in *Nymark* stated:  "the test for determining whether a financial institution owes a duty of care to a borrower-client ' "involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." ' " (*Ibid*.)

We have recognized that lenders have no duty to offer or approve a loan modification.  (*Weimer, supra*, 47 Cal.App.5th at p. 358; *Rossetta v. CitiMortgage, Inc.* (2017) 18 Cal.App.5th 628, 637-638 (*Rossetta*).)  "[A] loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money."  (*Weimer,* at p. 357, quoting *Lueras, supra*, 221 Cal.App.4th at p. 67.)

However, several courts, including this one, have found a duty, after applying the *Biakanja* factors, in situations where the lender or servicer voluntarily undertakes to renegotiate a loan modification and breached the duty to exercise reasonable care in processing the loan modification application.  (*Weimer, supra,* 47 Cal.App.5th at p. 356; *Rossetta, supra*, 18 Cal.App.5th at p. 640; accord *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1180-1183 (*Daniels*); *Alvarez, supra*, 228 Cal.App.4th at pp. 946, 949; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 881 (*Jolley*).)

## 2.  Plaintiff's Loan Modification Claim

As noted, we must start our analysis by identifying Penny Mac's allegedly negligent conduct because our analysis is limited to the specific action the plaintiff claims

Penny Mac had a duty to undertake.  (*Lueras, supra*, 221 Cal.App.4th at p. 62.)  Without clarity of the conduct upon which the alleged negligence is based, we have nothing to plug into the *Biakanja* analysis.  And that conduct must be beyond that which falls squarely within the scope of a lending institution's conventional role as a lender of money.

Looking first to the alleged second modification application, we note that receiving and considering loan modification applications is squarely within the conventional role of a lender of money.  While plaintiff's allegations establish Penny Mac received his second loan modification application, plaintiff alleged no facts establishing any conduct in connection with the alleged modification application that would bring Penny Mac's conduct outside that conventional role.  Indeed, as noted *ante*, plaintiff alleged no facts prior to oral argument establishing that Penny Mac even agreed to consider the application or engaged in processing it.  Nor has plaintiff ever set forth specific facts indicating Penny Mac somehow mishandled the application, gave erroneous advice, or made misrepresentations in accepting the application or during its processing.

Plaintiff relies on *Alvarez* and its conclusion that a loan servicer assumes a duty of care *when it agrees to review an application for loan modification*.  Relevant to a duty of care, the plaintiffs in *Alvarez* alleged "that defendants owed them a duty to exercise reasonable care in the review of their loan modification applications *once they had agreed to consider them*.  The complaint allege[d] . . . that defendants '*undertook to review*' plaintiffs' loans for potential modification under [HAMP] and that having done so they owed plaintiffs the duty to exercise reasonable care in processing and reviewing their applications for loan modifications in accordance with the federal HAMP guidelines."  (*Alvarez, supra*, 228 Cal.App.4th at pp. 944-945, italics added.)  The *Alvarez* plaintiffs alleged their modification applications had been mishandled.  Specifically, the complaint alleged that an employee of defendants named in the complaint informed plaintiff Alvarez his application for modification of the loan secured

29

by his primary residence had been rejected because his monthly gross income of $2,554.75 was inadequate, whereas his paystubs showed that his monthly gross income was $6,075. (*Id*. at p. 945.) Regarding a loan modification for one of Alvarez's rental properties, he was told that his application showed a $6,318.98 deficit in monthly income, but he alleged there was no such deficit. (*Ibid*.) Regarding a loan on modification for Alvarez's second rental property, the complaint alleged defendants falsely advised plaintiff that no documents had been submitted when plaintiff alleged documents were sent to and received by defendants. (*Ibid*.) Plaintiffs further alleged that after working with defendants for over two years to obtain a loan modification, defendants advised plaintiff that De Haro, a second lien holder, prevented the modification from taking place, which plaintiffs alleged was false. (*Ibid*.)

Given those specific allegations of mishandling, the *Alvarez* court weighed the *Biakanja* factors, considered relevant case law and concluded: "Here, *because defendants allegedly agreed to consider modification* of the plaintiffs' loans, the *Biakanja* factors clearly weigh in favor of a duty." (*Alvarez, supra*, 228 Cal.App.4th at pp. 948-949, italics added.)

No case has held a lender has a duty to offer or approve a loan modification application which necessarily gives rise to a tort duty of care. "[We] have found a duty after applying the *Biakanja* factors, *when the lender or servicer has voluntarily undertaken to renegotiate a loan modification* but breached the duty to exercise reasonable care in processing the loan modification application." (*Weimer, supra*, 47 Cal.App.5th at p. 356, italics added, [residential loan]; *Rossetta, supra*, 18 Cal.App.5th at p. 640 [residential loan]; see also *Daniels, supra*, 246 Cal.App.4th at pp. 1180-1183 [residential loan]; *Alvarez, supra*, 228 Cal.App.4th at pp. 946, 949, [residential loan]; *Jolley, supra*, 213 Cal.App.4th at p. 881 [construction loan].) We observed that whether a lender assumes a duty by *considering* a loan modification application presents a more nuanced question. At what point may it be said that "a borrower and lender enter into a

new phase of their relationship when they voluntarily undertake to renegotiate a loan, one in which the lender usually has greater bargaining power and fewer incentives to exercise care." (*Rossetta*, at p. 640, citing *Alvarez*, at p. 949.)

Conspicuously missing from plaintiff's complaint is any allegation of conduct which would establish that Penny Mac agreed to consider plaintiff's second loan modification application. As noted, plaintiff merely alleged that, after he submitted his second loan modification application, he "was continuing to have periodic contact with PennyMac, by and through his representative, regarding the loan modification . . . ." Plaintiff recognized this deficiency in his original briefing on appeal, stating that "when Penny Mac *seemingly agreed* to review [plaintiff] for a loan modification, it never actually completed the task, choosing instead to follow its original intended course of taking [plaintiff's] home away from him." (Italics added.) There is simply no allegation of conduct by which Penny Mac could be deemed to have voluntarily undertaken to negotiate a loan modification the second time. Indeed, there is no allegation that Penny Mac even represented to plaintiff that it was considering his second loan modification application. At oral argument, counsel belatedly represented that such an allegation can be made, but even then counsel's statement fell short the requirement to "spell out" "the specific proposed amendments" (*Brown*, *supra*, 153 Cal.App.4th at p. 112) and "specifically state" the "factual allegations" to support his claim (*Vanacore*, *supra*, 246 Cal.App.4th at p. 454). And, as we have already concluded, even those conclusory allegations are untimely.

Moreover, plaintiff has never made any allegation that Penny Mac engaged in conduct relative to the alleged second modification request beyond the role of a conventional lender. Plaintiff has asserted no specific facts establishing that Penny Mac affirmatively mishandled the application or made any representations to plaintiff about the viability of his application. (Cf. *Weimer*, *supra*, 47 Cal.App.5th at pp. 359, 361 [complaint alleged loan servicers reached out to plaintiff to inform him they would

31

process loan modification application submitted to a prior lender; multiple specific acts of mishandling alleged, requiring multiple resubmissions of the modification application; one loan servicer told plaintiff he would be approved for the modification and the succeeding servicer told plaintiff he qualified for a HAMP loan when he clearly did not]; *Rossetta*, *supra*, 18 Cal.App.5th at pp. 641, 643 [complaint alleged multiple specific acts of mishandling, requiring multiple resubmissions of the modification application; lender made misstatements about the status of the application; lender told plaintiff it would not consider loan modification application until plaintiff was three months behind in her mortgage payments, thereby making default a condition of being considered for a loan modification; lender denied the application for bogus reasons].) Here, there is only a bare allegation that Penny Mac breached its duty by its "negligent processing of his loan modification application."

In light of our conclusion that plaintiff failed to allege facts establishing that defendant agreed to consider his second loan modification application at any time prior to oral argument and further failed to allege any conduct that would be outside the role of a conventional lender, we need not engage in a *Biakanja* analysis as to plaintiff's loan modification claim. Indeed, as noted, we have no specific conduct to plug into a *Biakanja* analysis and as a result there are no facts relative to the second modification application that would move Penny Mac's relationship with plaintiff into the realm of tort liability for economic losses. (Cf. *Weimer*, *supra*, 47 Cal.App.5th at pp. 355, 360-366 [existence of special relationship determined by applying loan servicers' alleged conduct to the *Biakanja* factors].)

### 3. Plaintiff's Refusal to Accept Payment Claim

#### a. Conduct Outside the Conventional Role of a Lender

We next consider plaintiffs claim that, in November 2011, two months before he submitted his first loan modification application, six months before the notice of default was recorded, and a year before the foreclosure, Penny Mac refused to accept two

months' worth of payments that would have made plaintiff's loan current. This claim is based on the alleged conversation with an unnamed person at Penny Mac who he asserts told him " 'we don't want your money, we want your house, we will stop taking your payments and after you fall far enough behind we will foreclose on your home.' "

Under the deed of trust, a lender could refuse partial payments or payments insufficient to bring the loan current. The deed of trust states: "Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the loan current." But we find nothing in the deed of trust to suggest Penny Mac could refuse payments that would cure the default.[11] Plaintiff alleged in November 2011, he had saved enough money "to catch up those two past due months." Reading the allegations liberally, as we must (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22), plaintiff's allegation establishes the payments he proposed would have been sufficient "to bring the loan current." Failing to take payments that would make the loan current, based on the deed of trust, would have been outside Penny Mac's conventional role as a lender of money. In fulfilling that conventional role, lenders do not refuse pre-notice-of-default payments that would make the loan current and then inform the borrower its intent is to reject payments, wait the borrower out, and take the home from the borrower. Indeed, counsel for Penny Mac conceded at oral argument that it is not within the conventional role of money lenders to refuse payments. Although we have not applied the *Biakanja* factors in a mortgage foreclosure case outside the context of loan modification processing, we will proceed to consider the *Biakanja* factors as to this claim.

_____

[11] We also note that under Civil Code section 2924c, subdivision (a)(1), after a notice of default, Penny Mac would have been obligated to receive payments that would make the loan current.

33

### b. The Extent to Which Transaction Was Intended to Affect Plaintiff

As we see it, the "transaction" at issue is the ongoing loan agreement in the note and deed of trust. Plaintiff would be positively affected by being permitted to make his loan current, and Penny Mac's receipt of payments made on plaintiff's loan would benefit the loan owner. Thus, as a general matter, the first factor—the extent to which the transaction was intended to affect the plaintiff—would not seem to favor plaintiff over the lender.

### c. The Foreseeability of Harm to Plaintiff

It would be foreseeable that plaintiff would suffer harm as a result of Penny Mac refusing to accept two past-due payments on his account, as he would therefore remain in default. However, it was not foreseeable that plaintiff would stop making the payments he was obligated to make and that Penny Mac was obligated to accept. This factor does not favor a finding of duty of care.

### d. The Degree of Certainty Plaintiff Suffered Injury

Plaintiff asserts he was injured by the foreclosure on his home. In considering this *Biakanja* factor, we are not required to consider whether injury can be proven. (*Weimer*, *supra*, 47 Cal.App.5th at p. 361.) And for purposes of determining whether facts supporting a duty have been stated in the complaint, we need only determine whether the facts alleged establish that some injury is certain. (*Ibid.*) We conclude that plaintiff's allegations adequately establish certainty of injury at this stage of the proceedings and this factor cuts in favor of finding a duty of care.

### e. The Closeness of the Connection Between Defendants' Conduct and Injury

We see no connection between Penny Mac's alleged conduct and plaintiff's injury. A voice over the phone purportedly said, "we don't want your money, we want your house, we will stop taking your payments and after you fall far enough behind we will foreclose on your home." But plaintiff did not allege Penny Mac actually rejected

34

payments he tendered.  For example, he did not allege he sent Penny Mac payments that would cure the default and those payments were returned to him.  In the context of this case, we consider this factor to be important and it militates against the imposition of a tort duty.

### f.  The Moral Blame Attached to Defendants' Conduct

As alleged in the complaint, Penny Mac's conduct would be morally blameworthy.  However, the allegations also indicate that plaintiff's loan was past due. He needed a loan modification to avoid default and foreclosure, which, originally, was not a product of Penny Mac's conduct.  And plaintiff does not allege any fact that prevented him from actually tendering payments, even after the November 2011 phone call.  Plaintiff would have a stronger case if he submitted payments to Penny Mac and Penny Mac sent them back.  Absent that, we consider this factor neutral.

### g.  Policy of Preventing Future Harm

Imposing liability for such statements made by a Penny Mac representative would serve to prevent future harm to borrowers if lenders or loan servicers actually refuse to accept payments.  But we expect borrowers who have sufficient funds to cure a default will tender the payment and not be deterred by a voice on the phone.  We consider this factor neutral as well.

### h.  *Biakanja* Balancing

On balance, we conclude the factors set forth in *Biakanja, supra*, 49 Cal.2d 647, weigh against imposing a legal duty of care on Penny Mac in connection with plaintiff's negligence cause of action.  Accordingly, the trial court properly sustained Penny Mac's demurrer as to that cause of action.

### D.  Leave to Amend

Plaintiff emphasizes that the trial court considered the negligence cause of action for the first time in considering the demurrer to the first amended complaint, and he asserts he never had the opportunity to amend this cause of action.  In actuality, he did

have an opportunity to amend; like with his wrongful foreclosure claim, he just chose not to try. Because plaintiff chose to stand on the allegations concerning this cause of action in the first amended complaint without seeking to amend them in the trial court, we assume plaintiff stated the strongest case he could. (*Reynolds, supra,* 36 Cal.4th at p. 1091; *Alfaro, supra,* 171 Cal.App.4th at p. 1372.) We are not required to consider proposed amendments plaintiff could have made in the trial court.

Plaintiff, nevertheless, asserted in his appellate briefing that he could "certainly" amend his pleading to state a cause of action sounding in negligence as to his loan modification claim. He stated in his appellate briefing that he could address the *Biakanja* factors and the allegations relevant to each. He further asserted that he could add additional specific allegations "regarding the loan modification process and the manner in which Penny Mac handled that process."

Assuming plaintiff's ability to amend at this stage is not foreclosed by his failure to seek leave to amend in the trial court, we conclude that plaintiff has failed to show there is a reasonable possibility he could cure the defects in his complaint by amendment. Making a conclusory representation, as plaintiff did in his original briefing, that he could amend the complaint to cure the defects by addressing the *Biakanja* factors, by addressing allegations relevant to each factor, and by adding additional factual allegations is insufficient to establish that the complaint's defects could be cured. As noted, a party seeking to amend must set forth precisely what allegations are to be added. (*Casiopea*, *supra*, 12 Cal.App.5th at p. 664; *Vanacore*, *supra*, 246 Cal.App.4th at p. 454; *Brown*, *supra*, 153 Cal.App.4th at p. 112.)

Plaintiff's belatedly proposed amendment set forth in his supplemental briefing is not helpful either. Discussing the term "mishandling," used in the complaint, plaintiff

states that in the context of a loan modification, that is a "broad" term.[12]  According to

plaintiff, "mishandling" "can include delaying to act on a loan modification and certainly

can include as alleged foreclosing while a modification application is pending as alleged

in the Complaint."  But plaintiff did not allege specific facts in his supplemental briefing

that would support a claim that Penny Mac's conduct was outside the scope of a lending

institution's conventional role as a lender of money; nor has he asserted facts to plug into

the *Biakanja* analysis as to either claim supporting his negligence cause of action.

Indeed, as noted, regarding his loan modification claim, he has not alleged facts

establishing there was anything improper about foreclosing during the pendency of a

*second* modification request.[13]

---

[12]  In first amended complaint, plaintiff alleged "purposeful mishandling" in his first
cause of action for breach of the covenant of good faith and fair dealing and incorporated
that allegation by reference in his negligence cause of action.

[13]  Penny Mac argued in its supplemental briefing that plaintiff's theory suggests anytime
there is a loan modification, a foreclosure cannot take place.  In responding to this
argument, plaintiff notes in his supplemental briefing that "HBOR addresses this in that a
second application requires a material change to invoke the prohibition of a foreclosure
while a modification application is pending."  He requests leave to amend "to allege that
the alleged second modification application had a material change in that the Appellant's
income was materially different from the first application."  Plaintiff is correct on this
point as to HBOR, but it does not help him.  The Legislature prohibited dual tracking
only as to initial modification applications in HBOR, but allowed for an exception in
Civil Code section 2923.6, subdivision (g), which provides:  "In order to minimize the
risk of borrowers submitting multiple applications for first lien loan modifications for the
purpose of delay, the mortgage servicer shall not be obligated to evaluate applications
from borrowers who have been evaluated or afforded a fair opportunity to be evaluated
consistent with the requirements of this section, *unless there has been a material change
in the borrower's financial circumstances since the date of the borrower's previous
application and that change is documented by the borrower and submitted to the
mortgage servicer*."  (Italics added.)  As we have noted, and as plaintiff acknowledged in
the trial court, HBOR is not applicable here because it became effective after Penny
Mac's alleged conduct.  And, as we noted *ante*, plaintiff cites no HAMP rules that
precludes foreclosure during a second or subsequent request for a HAMP modification.

## IV. Breach of the Implied Covenant of Good Faith and Fair Dealing

### A. The Implied Covenant of Good Faith and Fair Dealing

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658, quoting *Brown v. Superior Court* (1949) 34 Cal.2d 559, 564.) However, "[t]he implied covenant of good faith and fair dealing *rests upon the existence of some specific contractual obligation.*" (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031, italics added.) "Generally, '[t]here is no obligation to deal fairly or in good faith absent an existing contract. [Citations.] If there exists a contractual relationship between the parties . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract.' " (*Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Assn.* (2018) 19 Cal.App.5th 399, 426, quoting *Racine & Laramie, Ltd.*, at p. 1032; accord *Santiago v. Employee Benefits Services* (1985) 168 Cal.App.3d 898, 905 [absent a contractual relationship, respondents could not be found to have breached the implied covenant of good faith and fair dealing].) "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654, 690.)

---

Nor did plaintiff allege HAMP provides an exception similar to Civil Code section 2923.6, subdivision (g). And in any event, plaintiff has not set forth specific facts showing a material change in his financial circumstances that took place at any point before the foreclosure that he could assert in an amended complaint. (*Casiopea*, *supra*, 12 Cal.App.5th at p. 664; *Vanacore*, *supra*, 246 Cal.App.4th at p. 454; *Brown*, *supra*, 153 Cal.App.4th at p. 112.)

## B. Additional Background

In the original complaint, the first amended complaint, and the second amended complaint, plaintiff identified Penny Mac as the loan servicer. Plaintiff alleged that loan servicing was transferred to Penny Mac in early 2010. Plaintiff further alleged that Quality Loan Service Corp., as acting or substituted trustee, processed the foreclosure and conducted the trustee's sale.

In the second amended complaint, plaintiff further alleged that the parties entered into a course of conduct resulting in an implied contract "whereby [Penny Mac] took over mortgage loan servicing and loan modification processing of Plaintiff's home loan from American Home Mortgage Servicing, Inc. . . . ."

Moreover, as the trial court noted, in addition to the representations in plaintiff's successive complaints, in his oppositions to Penny Mac's demurrers, plaintiff repeatedly stated that he had no written contract with Penny Mac. Plaintiff stated in his opposition to the demurrer to the first amended complaint, "it is admitted that there is no written contract between these parties," and asserted instead that an implied contract arose when Penny Mac took over servicing his loan. Plaintiff asserted that the "relationship between Plaintiff and . . . Penny Mac clearly involves an implied contract . . . ." Plaintiff asserted that, "since the underlying contract is an implied contract, a question of fact exists as to the exact terms of that implied contract."

Similarly, in his opposition to the demurrer to his second amended complaint, plaintiff stated that Penny Mac's argument that there could be no cause of action for breach of the implied covenant of good faith and fair dealing because there was no written contact between the parties had no bearing on the issues before the court because the second amended complaint "specifically states that the cause of action . . . is based on the existence of an implied agreement that existed between the parties." Plaintiff asserted that Penny Mac "knowingly and willingly undertook an implied contractual relationship with Plaintiff . . . ." Plaintiff asserted that an "implied contract has been in effect

39

between Plaintiff and Penny Mac ever since [Penny Mac] took over the servicing of his home loan in July 2010." He further asserted that the "relationship between Plaintiff and . . . Penny Mac clearly involves an implied contract . . . ."

In the third amended complaint, plaintiff again identified Penny Mac as the loan servicer. He asserted that, in June 2010, his "loan was transferred from Quick Loan Funding to Penny Mac Mortgage Investment Trust Holdings 1, LLC (Penny Mac Trust)." For the first time, however, plaintiff asserted that, as of June 15, 2010, when Penny Mac sent him a letter informing him that the loan had been transferred to Penny Mac, "Penny Mac was either the owner of the loan or acting as agent of Penny Mac Trust regarding the loan." Plaintiff asserted that the contract on which this cause of action was based "was the direct written Note and Deed of Trust which as alleged herein was transferred to Penny Mac Trust and then to Penny Mac or in the alternative Penny Mac was acting as the agent of Penny Mac Trust with regards to the acts stated herein."

### C. The Sham Pleading Doctrine

"It is axiomatic that the function of a demurrer is to test the legal sufficiency of the pleading by raising questions of law. [Citation.] It is also well established that, when reviewing a judgment entered following the sustaining of a demurrer without leave to amend, the appellate court must assume the truth of the factual allegations of the complaint. [Citation.] However, an exception exists where a party files an amended complaint and seeks to avoid the defects of a prior complaint either by omitting the facts that rendered the complaint defective or by pleading facts inconsistent with the allegations of prior pleadings. [Citations.] In these circumstances, the policy against sham pleading permits the court to take judicial notice of the prior pleadings and requires that the pleader explain the inconsistency. If [the pleader] fails to do so the court may disregard the inconsistent allegations and read into the amended complaint the allegations of the superseded complaint." (*Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383-384 (*Owens*).) Thus, "[u]nder the sham pleading doctrine, a pleader cannot

40

circumvent prior admissions by the easy device of amending a pleading *without explanation*." (*Womack v. Lovell* (2015) 237 Cal.App.4th 772, 787.)

"The sham pleading doctrine is not ' "intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts." ' [Citation.] Instead, it is intended to enable courts ' "to prevent an abuse of process." ' " (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 426.) "[T]he trial court has every right to guard against sham pleadings and to prevent abuse of the litigation process." (*Sanai v. Saltz* (2009) 170 Cal.App.4th 746, 768 (*Sanai*).) "For example, the trial court has discretion to deny leave to amend when the proposed amendment omits or contradicts harmful facts pleaded in a prior pleading unless a showing is made of mistake or other sufficient excuse for changing the facts. Absent such a showing, the proposed pleading may be treated as a sham." (*Ibid.*, citing *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946 (*Vallejo Development Co.*) & *Amid v. Hawthorne Community Medical Group, Inc.* (1989) 212 Cal.App.3d 1383, 1390.)

If a trial court denies leave to amend based on application of the rule against sham pleading, we review the denial of leave for abuse of discretion. (*Vallejo Development Co., supra*, 24 Cal.App.4th at p. 946 [discussing sham pleading doctrine and concluding that the trial court did not abuse its discretion in denying leave to file second amended complaint]; accord, *Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 951 (*Berman*) [trial court erred and abused its discretion in applying the sham pleading rule].)

### D. Plaintiff's Contentions

Plaintiff asserts that the third amended complaint was not a sham pleading. He asserts that, in prior iterations of the complaint, he did not state who the owner of his loan was, and he did not allege that Penny Mac was *not* the owner of the loan. Plaintiff asserts that it was only by the time he prepared his third amended complaint that he was in a position to make allegations as to the ownership of the loan. He asserts that he did not know all of the operative facts regarding the ownership of his loan until he retained new

41

counsel and filed the third amended complaint. Plaintiff asserts that he did not omit harmful allegations from, or add contradictory allegations to, his third amended complaint. Therefore, according to plaintiff, the sham pleading doctrine did not apply. As for the representations made in opposition to two demurrers, plaintiff asserts that the statement that there was no written contract between him and Penny Mac was not untrue "from the point of view that Penny Mac and [plaintiff] never *originated* a contract as between themselves. That does not, however, mean that Penny Mac could not be *assigned* the Note and Deed of Trust to claim its beneficial interest." Plaintiff also asserts that, while the sham pleading doctrine applies to statements made in a complaint, it does not apply to arguments set forth in opposition to a demurrer. According to plaintiff, judicial estoppel would be the applicable doctrine to apply where a party has taken inconsistent positions in judicial proceedings.

As to the merits, plaintiff asserts that his allegations were sufficient. He asserts that, if Penny Mac was the owner of the loan, it would be subject to the loan agreement. If Penny Mac was merely the servicer of the loan, based on language in the Deed of Trust, it would retain mortgage loan servicing obligations to plaintiff. Thus, according to plaintiff, when Penny Mac refused to accept plaintiff's two past-due payments, and when it told plaintiff that it would refuse to accept future payments and preferred a default so it could foreclose, Penny Mac frustrated plaintiff's ability to perform under the contract, and therefore breached the implied covenant of good faith and fair dealing.

### E. Analysis

### 1. Sham Pleading and the Existence of a Written Contract

Prior to the filing of the third amended complaint, plaintiff's allegations against Penny Mac in connection with his cause of action premised on breach of the implied covenant of good faith and fair dealing were always based on an implied contract alleged to exist between plaintiff and Penny Mac, the loan servicer. The trial court afforded plaintiff several opportunities to cure the deficiencies in his pleadings concerning the

42

existence and nature of the contract. After repeatedly failing to plead a legally sufficient cause of action premised on breach of the implied covenant of good faith and fair dealing premised on the theory of an implied contract, in the third amended complaint, plaintiff altered course and, for the first time, asserted that Penny Mac either owned the note and deed of trust or acted as agent for the owner, and the cause of action was premised on the existence of a written contract.

We conclude that, in his third amended complaint, plaintiff "plead[ed] facts inconsistent with the allegations of prior pleadings" in order "to avoid the defects of [several] prior complaint[s]." (*Owens, supra*, 198 Cal.App.3d at pp. 383-384.) We further conclude that plaintiff failed to adequately explain the inconsistencies. (See *ibid*.) The third amended complaint "contradicts harmful facts pleaded in . . . prior pleading[s] . . . ." (*Sanai, supra*, 170 Cal.App.4th at p. 768.) In the first three pleadings, plaintiff alleged that Penny Mac's role was limited to that of loan servicer. While plaintiff asserts that "he *never* alleged that Penny Mac was *not* the owner of his loan," this hypertechnical argument exalts form over substance. True, in plaintiff's prior pleadings, he never included the absurd and superfluous allegation: "Penny Mac was not the owner of the loan." However, he did identify Penny Mac's alleged role and basis for liability, which was as servicer of the loan, not owner of the loan. We conclude that the trial court did not abuse its discretion in sustaining the demurrer without leave to amend based on the sham pleading doctrine. (See generally *Berman, supra*, 56 Cal.App.4th at p. 951; *Vallejo Development Co., supra*, 24 Cal.App.4th at p. 946.)

Furthermore, while not in the pleadings, plaintiff repeatedly admitted in his filings in opposition to Penny Mac's demurrers that there was no written contract between plaintiff and Penny Mac and that the cause of action premised on breach of the implied covenant of good faith and fair dealing was based on an alleged implied contract. Our research has not yielded any published case in which the sham pleading doctrine has been applied to a plaintiff's filings in opposition to a demurrer. For obvious reasons, the sham

pleading doctrine would seem to be intended to apply to pleadings. We note that "[t]he pleadings are the formal allegations by the parties of their respective claims and defenses, for the judgment of the court" (§ 420), and that "[t]he pleadings allowed in civil actions are complaints, *demurrers*, answers, and cross–complaints" (§ 422.10, italics added). However, the rationale underlying the sham pleading doctrine would seem to apply: avoiding the shortcomings of a prior filing—in this case papers in opposition to a demurrer—by alleging facts inconsistent with those shortcomings in a subsequent complaint.

Moreover, "[t]he allegations of the complaint must for the purposes of demurrer be accepted as true *unless they are contrary to facts of which a court may take judicial notice*." (*Alisal Sanitary Dist. v. Kennedy* (1960) 180 Cal.App.2d 69, 73 (*Alisal Sanitary Dist.*), italics added.) We may "take judicial notice of admissions in plaintiff's oppositions to the demurrer[s]." (*Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518 (*Rodas*), citing Evid. Code, § 452, subd. (d).) " ' "[T]he complaint should be read as containing the judicially noticeable facts, 'even when the pleading contains an express allegation to the contrary.' [Citation.] A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint *or by suppressing facts which prove the pleaded facts false*." ' " (*State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 412 (*Metz*), quoting *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491 (*McKell*), italics added.) "In determining the sufficiency of a complaint a court should consider those facts of which it has judicial notice, even though they are not pleaded." (*Arthur v. Oceanside-Carlsbad Junior College District* (1963) 216 Cal.App.2d 656, 661.)

As stated *ante*, plaintiff admitted in more than one filing prior to the third amended complaint that there was no written contract between him and Penny Mac. As also stated *ante*, we may take judicial notice of plaintiff's admissions in oppositions to

44

demurrers (*Rodas, supra*, 87 Cal.App.4th at p. 518), and "[t]he allegations of the complaint must for the purposes of demurrer be accepted as true *unless they are contrary to facts of which a court may take judicial notice*." (*Alisal Sanitary Dist., supra*, 180 Cal.App.2d at p. 73, italics added.)

The allegations in plaintiff's third amended complaint include the allegations that his contractual relationship with Penny Mac was based on a written contract; that this contractual relationship incorporated the implied covenant of good faith and fair dealing; and that Penny Mac breached the implied covenant of good faith and fair dealing. These allegations "are contrary to facts of which a court may take judicial notice" (*Alisal Sanitary Dist., supra*, 180 Cal.App.2d at p. 73), specifically the admissions in plaintiff's oppositions to Penny Mac's demurrers that plaintiff had "no written contract" with Penny Mac, and that instead the cause of action was premised on an implied contract. Plaintiff may not avoid Penny Mac's demurrer by pleading facts or positions in his third amended complaint " ' "that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false." ' " (*Metz, supra*, 149 Cal.App.4th at p. 412; *McKell, supra*, 142 Cal.App.4th at p. 1491.)

We note that the basis for plaintiff's new allegations in his third amended complaint—that Penny Mac was either the owner of the loan or acting as agent for the loan, and therefore the contractual relationship between plaintiff and Penny Mac was based on the note and deed of trust—was, at least in part, a June 15, 2010, letter to plaintiff "saying that 'the home loan' was transferred to Penny Mac itself." (See fn. 2, *ante*.) Obviously this letter to plaintiff dated June 15, 2010, constituted information available to plaintiff before he commenced this action and at all times thereafter, which contradicts the excuse that plaintiff did not have this information before he filed his third amended complaint. Thus, plaintiff's representation that, "in his previous versions of his complaint, [plaintiff] was unable to allege anything as to the ownership of his loan" is, at least in part, belied by the record.

45

Plaintiff also relies on the fact that, prior to its opposition to the third amended complaint, Penny Mac had not included the deed of trust with its requests for judicial notice. Of course, as the mortgagor, plaintiff always had access to, and likely had, a copy of the deed of trust, which is signed by plaintiff and notarized on July 21, 2006, and recorded on July 27, 2006.[14]

Plaintiff seeks to persuade us that his allegations were not contradictory because his representations that there was no written contract between him and Penny Mac "was not untrue from the point of view that Penny Mac and [plaintiff] never *originated* a contract as between themselves. That does not, however, mean that Penny Mac could not be *assigned* the Note and Deed of Trust to claim its beneficial interest." While this may be true in a technical sense, it is also the case that plaintiff was not foreclosed from advancing this allegation previously. However, he did not advance this theory until he repeatedly failed to allege a legally sufficient basis for his now-abandoned position that an implied contract existed between him and Penny Mac and he has offered no reason for failing to do so.

Thus, we conclude that the trial court did not abuse its discretion in concluding that plaintiff's third amended complaint did indeed constitute a sham pleading. (See generally *Berman, supra*, 56 Cal.App.4th at p. 951; *Vallejo Development Co., supra*, 24 Cal.App.4th at p. 946.)

## 2. Allegations Premised on an Implied Contract Between the Parties

Additionally, plaintiff continues to allege that Penny Mac was the loan servicer. While we have not readily found California appellate cases directly on point, those

---

[14] Penny Mac's request for judicial notice included an assignment of the deed of trust from MERS as nominee for Quick Loan Funding and its successors and assigns, to Penny Mac Trust dated March 19, 2012. That document was recorded in the Recorder's office of Sacramento County on March 29, 2012, and was also accessible to plaintiff and his attorneys before plaintiff commenced this action.

federal courts applying California law that have considered the issue have concluded that, under California law, a loan servicer is not party to a deed of trust. (See, e.g., *Conder v. Home Savings of America* (C.D.Cal. 2010) 680 F.Supp.2d 1168, 1174 ["The fact that [the loan servicer] entered into a contract with [the mortgagee] to service Plaintiff's loan does not create contractual privity between [the servicer] and Plaintiff"]; *Lomboy v. SCME Mortg. Bankers* (N.D.Cal. May 26, 2009, No. C-9-1160 SC) 2009 U.S. Dist. LEXIS 44158, at p. *14, 2009 WL 1457738, at *5 ["a loan servicer . . . is not a party to the Deed of Trust itself"]; *Connors v. Home Loan Corp.* (S.D.Cal. May 9, 2009, Civ. No. 08cv1134) 2009 U.S. Dist. LEXIS 48638, at p. *17, 2009 WL 1615989, at p. *6 ["Plaintiff has failed to assert or differentiate the roles and functions of defendants ASC and US Bank. . . . If ASC is a loan servicer, ASC is not a party to the Deed of Trust itself"].)

We also reject plaintiff's contention, whether in connection with his written contract theory or implied contract theory, that Penny Mac would become a party to the deed of trust based on language in that document which states: "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. *If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not*

*assumed by the Note purchaser unless otherwise provided by the Note purchaser*." We do not agree with plaintiff that the italicized provisions gave rise to a contractual relationship between Penny Mac and plaintiff, where none existed before, pursuant to which plaintiff can assert a cause of action premised on breach of the implied covenant of good faith and fair dealing. This language merely describes what entity will be performing the tasks of loan servicer under particular circumstances.

Thus, in addition to the sham pleading doctrine, in the absence of any legally sufficient allegations to support plaintiff's earlier contention that the implied covenant of good faith and fair dealing arose from an implied contract between the parties, we agree with the trial court that plaintiff's allegations "lack[] the existence of any contract on which the breach of the implied covenant claim could be based." Accordingly, we conclude that the trial court properly sustained Penny Mac's demurrer to plaintiff's third amended complaint.[15]

## V. Intentional Interference with Contract

Plaintiff's final argument is that, assuming we conclude that the trial court properly sustained Penny Mac's demurrer as to the cause of action for breach of the implied covenant of good faith and fair dealing because of the absence of contractual privity, we should grant him leave to amend to assert a cause of action sounding in intentional interference with contract. Plaintiff asserts that Penny Mac's conduct in refusing to allow plaintiff to make payments on the loan interfered with the contract between him and the loan owner by refusing to allow him to perform. Additionally, Penny Mac's alleged statements that it did not intend to accept plaintiff's payments and

---

[15] In light of our determination, we need not address in further detail plaintiff's contentions asserting that the allegations in plaintiff's third amended complaint were legally sufficient. Nor need we address plaintiff's contention that the trial court conflated the sham pleading doctrine with the doctrine of judicial estoppel.

that it instead intended to push plaintiff into default and then foreclose on his home demonstrates an intent to interfere with the contract.[16]

"[O]nly 'a stranger to [the] contract' may be liable for interfering with it." (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1603 (*Mintz*), citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513, 507, 514 (*Applied Equipment Corp.*).) A claim for tortious interference "does not lie against a party to the contract" (*Applied Equipment Corp.*, at p. 514), *or against the party's agents* (*Mintz*, at pp. 1603-1607). "The tort duty not to interfere with the contract falls only on strangers--interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment Corp.*, at p. 514.) And critical here, an agent cannot be liable for interfering with its principal's contracts. (*Mintz*, at pp. 1603-1607; accord, *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24-25 ["corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract"].)

As the loan servicer, Penny Mac is no stranger to the contract represented by the note and deed of trust. Under the deed of trust, the loan servicer manages the borrower's payment obligations and performs other administrative tasks on behalf of the lender. Thus, even if plaintiff had properly alleged an act of intentional interference by Penny Mac, Penny Mac cannot be held liable for this tort because, in its role as the loan servicer, it was acting as the agent for the owner of the note and deed of trust. In performing this role, Penny Mac cannot be held liable for intentionally interfering with its principal's contracts.

---

[16] Because we proceed to reject on the merits plaintiff's contention that he should be granted leave to amend to assert a cause of action for intentional interference with contract, we need not consider Penny Mac's contention, raised in a footnote, that plaintiff's contention is barred as "untimely."

Penny Mac relies on *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 in asserting that plaintiff cannot state a cause of action for intentional interference with contract. Plaintiff emphasizes that the language from that case on which Penny Mac relies states, " ' "*ordinarily* corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract . . . ." ' " (*Id.* at p. 45, italics added.) Plaintiff points out that agents may be liable for intentional interference with contract where the agents are acting " 'as individuals for their individual advantage.' " (*Mintz, supra*, 172 Cal.App.4th at p. 1605, citing *Applied Equipment Corp., supra*, 7 Cal.4th at p. 512, fn. 4, & *Doctors' Co.*, at p. 47.) Plaintiff asserts that the question as to whether Penny Mac was acting individually for its individual advantage presents a question of fact not to be resolved at this stage of the litigation. Indeed, plaintiff asserts that it can reasonably be inferred that Penny Mac was acting individually for its own individual advantage because, in refusing to accept the payments, it was acting against its principal's best interests.

To dispose of plaintiff's contentions in this regard, we turn to the relevant discussion in *Mintz*. (*Mintz, supra*, 172 Cal.App.4th 1594.) In that case, like here, the plaintiff asserted that the defendant "was 'acting for its own financial advantage' when it denied coverage . . . and that the 'agent's immunity rule' does not apply when the agents are acting 'as individuals for their individual advantage.' " (*Id.* at p. 1605.) The court explained:

"First, the 'agent's immunity rule' has no direct applicability to a claim for interference with contract rights. The rule is simply that 'duly acting agents and employees cannot be held liable for conspiring with their own principals . . . .' [Citation.] While the agent's immunity rule ' "*derives from* the principle that ordinarily corporate agents and employees acting for or on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract" ' [citation], the rule, on its face, applies only to claims of conspiracy to commit a tort or violate a statute. [Citation.] As the court

50

stated in [*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568], 'the exception for conduct undertaken in pursuit of a personal interest or advantage *applies only to the agent's immunity rule*. It does not relax the requirement that to be liable for conspiracy to breach a duty, the defendant must be bound by that duty and capable of breaching it.' [Citation.] . . . The only question is whether the representative of a contracting party may be held liable for the substantive tort of interfering with the contract. The cases answer that question in the negative. [Citations.]

"Second, the conclusion that there is no 'financial advantage' exception to the rule that a corporate agent cannot be liable for interfering with its principal's contract makes good sense. Every agent, in one way or another, acts for its own financial advantage when it acts for its principal, because the agent is compensated by its principal, and conduct in furtherance of the principal's interest will necessarily serve the agent's interests as well. A 'financial advantage' exception to the sound rule that the contracting party's agent, like the contracting party, cannot be liable for interference with the contract, would entirely swallow up the rule.

"Third, even if a 'financial advantage' exception were applicable to the rule that an agent cannot be liable for interfering with its principal's contract, the cases discussing the exception to the agent's immunity rule demonstrate that merely receiving monetary compensation for its services to the principal is not enough. As stated in *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 834, '[c]ases have interpreted the "financial advantage" exception to the agent's immunity rule to mean a personal advantage or gain that is over and above ordinary professional fees earned as compensation for performance of the agency.' *Berg & Berg* involved a statutory provision with exceptions that allowed a conspiracy claim against an attorney; the exceptions mirrored those carved out from the agent's immunity rule. The court held the term ' "in furtherance of the attorney's financial gain" ' meant that 'through the conspiracy, the attorney derived economic advantage *over and above monetary*

51

*compensation received in exchange for professional services actually rendered* on behalf of a client.' [Citation.] Even allegations of excessive billing for the services rendered by the attorney did not satisfy the financial gain requirement of the statute's exception. [Citation.]

"In short, the agent's immunity rule, with its exceptions, applies to civil conspiracy claims, which this is not. And, even if the 'financial advantage' exception could be applied in the context of a claim for interference by an agent with its principal's contract, Mintz's allegations that Blue Cross was 'acting for its own financial interests,' and 'engaged in this conduct for the purpose of obtaining financial incentives available to it under the Plan for keeping plan costs down,' would be insufficient to state the necessary economic advantage 'over and above' the compensation received in exchange for Blue Cross's services to CalPERS. [Citation.]

[¶] . . . [¶]

"Because the representative of a contracting party may not be held liable for the tort of interfering with its principal's contract, Mintz cannot state a cause of action against Blue Cross for intentional interference with contract rights." (*Mintz, supra*, 172 Cal.App.4th at pp. 1605-1607, fn. omitted.)

We find the reasoning of the *Mintz* court persuasive and applicable here. Moreover, even if there were a "financial advantage" exception that could be applied in this context—a possibility the *Mintz* court rejected—we note that plaintiff has not shown us specific factual allegations establishing an advantage accruing to Penny Mac. On the facts as alleged by plaintiff, there was no economic advantage accruing to Penny Mac over and above the compensation it received as loan servicer.

We conclude that it is not reasonably possible that, if afforded the opportunity, plaintiff can assert a legally sufficient cause of action against Penny Mac for intentional interference with contract.

*****

## DISPOSITION

The judgment is affirmed.  Penny Mac is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278, subd. (a)(1), (2).)

_____/s/_____
MURRAY, J.

We concur:

_____/s/_____
RAYE, P. J.

_____/s/_____
BLEASE, J.